**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5701-11T2

L.R.,

    Petitioner-Appellant,

v.

DIVISION OF DISABILITY SERVICES,

    Respondent-Respondent.

_____

**APPROVED FOR PUBLICATION**

**February 6, 2014**

**APPELLATE DIVISION**

Argued September 11, 2013 — Decided February 6, 2014

Before Judges Fuentes, Simonelli and Fasciale.

On appeal from the New Jersey Department of Human Services, Division of Disability Services.

Susan W. Saidel argued the cause for appellant (Disability Rights New Jersey, attorneys; Ms. Saidel, of counsel and on the brief).

Jennifer Simons, Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Simons, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

L.R. participates in the Personal Assistance Service Program (PASP) established by the Legislature under the Personal Assistance Services Act, N.J.S.A. 30:4G-13 to -22, (the Act).

The PASP is administered by the Division of Disability Services (DDS or Division), in the New Jersey Department of Human Services.[1] As a resident of Hunterdon County, L.R. was able to receive PASP assistance benefits under the "cash management plan" earlier than other similarly situated eligible consumers residing in other counties in the State.[2] In December 2009, L.R. requested to use the unspent part of her monthly budgeted cash allowance to pay for the landline connection to her residence phone, cell phone service, and internet access.

The Division denied her request on January 6, 2010. Relying on N.J.A.C. 10:140-2.2(e), the Division determined it was not obligated to pay for services that are not related to

---

[1] DDS defines its core mission as "serving people who have become disabled as adults, whether through illness or injury. Such conditions are also called late-onset disabilities. It is estimated that one in five people – about 1.75 million New Jerseyans – has a disability that may limit their physical or cognitive function." *Division of Disability* Services, STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES (January 21, 2014), http://nj.gov/humanservices/dds/home/.

[2] In March 2000, Hunterdon County became the first county in the State to use the cash management plan as a pilot program. The cash management model was adopted by Essex County in July 2001. The Division convened a "PASP Cash Model Legislative Panel" in 2005 to develop a legislative proposal to implement the cash model approach as a formal amendment to the Act. The Legislature formally amended the Act to incorporate the cash management model approach. The legislation was signed into law by Governor Corzine effective November 20, 2009. 43 N.J.R. 2551(a)(Oct. 3, 2011).

the consumer's personal care or performed by a personal assistant. According to the Division, L.R. was only entitled to receive financial assistance to pay the cost of a personal assistant.

Although L.R. had the right to appeal an adverse agency action under N.J.A.C. 10:140-3.10, and to further file an administrative appeal of an adverse decision with the PASP State Program Administrator, N.J.A.C. 10:140-3.11(d), she claims that her initial efforts to challenge the denial of her request were met with great resistance, misinformation, and obfuscation.[3] L.R. eventually filed an administrative appeal which was transferred to the Office of Administrative Law (OAL) for adjudication.

---

[3] In a certification included in her appellate appendix, L.R. averred that the fiscal intermediary for the Hunterdon County PASP told her there was no way for her to challenge this determination by way of an appeal, grievance procedure, or other form of reconsideration. Although these allegations have not been confirmed, we expect the Division to investigate this matter as a possible violation of L.R.'s Personal Assistance Consumer's Bill of Rights under N.J.S.A. 30-4G-16.1(h), (i) and (j).

The fiscal intermediary is the agency that disburses "the cash benefit to consumers under the Personal Assistance Services Program." N.J.A.C. 10:140-1.4. The fiscal intermediary also serves as the business agent for the consumer and prepares "the payroll checks and other disbursements at the direction of the consumer, as well as keep records of all transactions." Ibid. (Emphasis added).

Because the salient facts were not disputed, both sides moved for summary decision before the Administrative Law Judge (ALJ) assigned to the case. After considering the arguments presented, the ALJ issued an initial decision holding that under N.J.S.A. 30:4G-14, PASP funding can only be used to cover the cost of employing "personal care assistants" to perform "personal assistance services," as defined in N.J.A.C. 10:140-1.4. The ALJ thus accepted the Division's position to limit PASP benefits to providing "personal care services through personal care assistants."

As a corollary to this principal ruling, the ALJ rejected L.R.'s argument that the programmatic funding restrictions endorsed by the Division here were not applicable to individuals receiving PASP funding through the "cash management model." As authorized by N.J.A.C. 10:140-3.11(e), the Commissioner's final decision adopted without modification the ALJ's findings and conclusions of law. Although the Commissioner concluded that as a matter of law, the Legislature intended the Act "to provide individual recipients with choice and control over their chosen services," he nevertheless concluded L.R. was not entitled to use unspent budgeted funds under the cash management plan to offset the cost of internet access and/or to pay for the use of a cellular phone or landline telephone service in her residence.

4                                    A-5701-11T2

L.R. now appeals to this court pursuant to N.J.A.C. 10:140-3.11(f), arguing that the Commissioner's decision to deny her request is arbitrary and capricious because it undermines the expressed purpose of the Act, "to promote the greatest possible degree of self-control and self-direction on the part of each recipient of services." N.J.S.A. 30:4G-15. According to L.R., the Legislature created the PASP "cash management model" to give eligible participants the flexibility to utilize unspent monthly budgeted funds in a manner that achieves a greater level of independence and autonomy over their personal activities.

We agree with L.R.'s arguments and reverse. Our legal analysis will be informed by the following uncontested facts.

I

L.R. is a fifty-four-year-old woman who suffers from multiple disabilities[4] that severely limit her everyday

---

[4] L.R. has osteoarthritis and bone spurs in her neck which causes pain and weakness throughout her arms and inhibits her ability to perform tasks requiring repetitive motions; she has difficulty reaching and retrieving items and is unable to lift or move anything that weighs more than ten pounds; she suffers from post-concussion syndrome with visual tracking difficulties, migraine headaches, vertigo, light sensitivity, memory problems, dry eye, and cataracts in both eyes; she has respiratory problems including pneumonia, asthma, respiratory allergies, and vocal cord dysfunction. She uses an inhaler and nebulizer to treat these respiratory problems and, as a consequence, is highly susceptible to respiratory infections. As a prophylactic measure, she uses a surgical mask when she leaves her residence
(continued)

activities.  She uses a "variety of assistive devices" to get around her home and travel outside her immediate environment.  These include "a power wheelchair, a rolling walker, a quad cane, a reacher,[5] and a stair lift."  She spends nearly all of her time at home.  It is thus undisputed that L.R. is eligible to receive PASP for a "permanent physical disability" as that term is defined in N.J.S.A. 30:4G-14.[6]

---

(continued)
or when people come to visit.  She also has digestive problems that restrict her nutritional intake.

[5] We take judicial notice under N.J.R.E. 201(b)(1) that a "reacher" (a/k/a "grabber") is a hand-operated mechanical device, with a manual grip attached to a metal pole that extends approximately three to four feet in length from the handle, and ends with an attached "V" shaped grip or retrieving claw.  By closing or opening the manual grip, the consumer is able to adjust and manipulate the tension cords that run the length of the pole, and ultimately attach to the grip claw.  The consumer opens or closes the "V" shaped grip by closing or opening the "reacher's" handgrip.  This also allows the consumer to adjust the pressure of the retrieving claw to retrieve items as small as a paperclip lying on the floor, as delicate and fragile as a sheet of paper or a piece of jewelry, or as heavy as a book, magazine, box, or bottle weighing as much as two to three pounds.  This device is an example of the type of unconventional item that serves the needs of PASP consumers outside the traditional "personal servant" paradigm.

[6] N.J.S.A. 30:4G-14 defines "Permanent physical disability" as "a severe impairment of a permanent nature which so restricts a person's ability to perform essential activities of daily living that the person needs assistance to maintain the person's independence and health."  Although the Legislature directed the Commissioner of Human Services to "adopt rules to effectuate the purposes of this [A]ct," N.J.S.A. 30:4G-21, N.J.A.C. 10:140-4.1 merely adopts the statutory definition without elaboration.  In

(continued)

<u>PERSONAL ASSISTANCE SERVICE PROGRAM</u>

Established under the Act in 1987, the Legislature directed the Division to administer the PASP through designated county-based agencies operating in each of the State's twenty-one counties. <u>N.J.S.A.</u> 30:14G-15. The designated county agency is charged with the responsibility of assisting

> adults with permanent physical disabilities in the performance of routine, nonmedical tasks that are directly related to maintaining their health and independence, in order to enable these persons to be employed or receive training or education related to employment, parenting, or volunteering, or to support community-based independent living. The program shall seek to promote the greatest possible degree of self-control and self-direction on the part of each recipient of services.

> [<u>Ibid.</u>]

Before 2009, the PASP operated using two different assistance models. The traditional service model provided a set number of hours of "personal assistance services" to the consumer. The Legislature defined "personal assistance services" under the Act to encompass "health and chore related tasks performed by a personal assistant. Personal assistance services include, <u>but are not limited to</u>, assistance in

---

(continued)
fact, the Commissioner adopted this approach with respect to many other regulations promulgated by under the Act.

essential daily activities such as bathing, dressing and meal preparation; assistance with mobility, laundry and shopping; and driving or other forms of transportation." (Emphasis added.) N.J.S.A. 30:4G-14. The eligible consumer receives a maximum of forty hours per week of personal assistance services. N.J.A.C. 10:140-2.1(a)(8).

## CASH MANAGEMENT MODEL

Commencing on November 20, 2009, the Legislature amended the PASP to "enable the program to be operated on a 'cash and counseling' model, wherein the consumer of personal assistance services exercises control over the individual workers the consumer employs, and manages and directs his own service plan." ASSEMBLY HUMAN SERVICES COMMITTEE STATEMENT TO ASSEMBLY, No. 2889, 2008 Legis. Bill Hist. N.J. A.B. 2889. The Act defines "Cash Management Plan" as "the document used by the program which indicates the monthly cash allowance and details the services and supports required by the consumer in order to meet the consumer's personal care needs." N.J.S.A. 30:4G-14; N.J.A.C. 10:140-1.4.

"The individual personal assistance services plan shall serve as the template for the creation of the consumer's cash management plan." N.J.A.C. 10:140-3.3(c). The cash management plan serves a budgetary purpose by showing how the consumer's

monthly cash allowances are utilized to meet the consumer's needs. Ibid. The central overriding theme of the cash model plan is to give PASP consumers greater flexibility to determine what services they need to deal with the travails of daily personal activities, and control over how PASP budgeted funds are spent to underwrite the cost of those personalized services.

The Division made clear these twin policy goals at the time it proposed a series of regulatory revisions required to implement the cash management plan. The statement explaining the need to amend N.J.A.C. 10:140-3.3(a), (the regulation that describes the traditional "individual personal services plan" and the "cash management plan") illustrates this point.

> N.J.A.C. 10:140-3.3(a) is proposed for amendment to reflect that an individual personal assistance services plan is to be designed by the consumer in consultation with the county designated agency. The Division is proposing this change in support of the concept of consumer self-direction that is the foundation of the PASP. The term "individualized needs" has be substituted for "specific needs" to better clarify that the plan is driven by the needs of the individual client. Rule text has also been deleted that explains the role of the county designated agency in preparation of the individual personal assistance services plan. This change is being made because the text is redundant in consideration of language that has been proposed for addition to this subsection.
>
> [43 N.J.R. 2551(a)(October 3, 2011) (Emphasis added.)]

A-5701-11T2

The informational material provided to PASP participants by the Division reflects and highlights the consumer-centric policy underpinning the cash management model of funding. As the Division explains, the cash management approach is intended to provide consumers with "more control over their life." Toward that end, the Division emphasizes the four key features of the cash management model:

- Consumers make the decisions!
- Consumers have choices they never had before!
- Consumers decide what they want!
- Consumers receive a cash grant every month to buy your own services!

Consistent with this policy directive, the Division has authorized participants receiving PASP benefits through the cash management model to use unspent budgeted funds to buy wheelchairs, wheelchair lifts, emergency alert service devices, and check printing machines. L.R. thus argues that communication services such as internet access, cellular phone service, and a landline connection to the fax machine fall within the category of items intended to increase the participant's level of independence and personal autonomy.

The following excerpts from L.R.'s certification describe the real life, practical implications of this policy directive.

> The cell phone allows me to send emails, text messages, and make phone calls. Since

it is portable, I can stay connected anytime and anywhere.

.  .  .  .

I use the computer and the internet for the following: for banking and to pay bills, to keep track of my credit record; to participate in an online housing course and to keep in contact with my housing counselor; to research the best prices and to get coupons, to get gluten free recipes, to shop for groceries, office supplies, supplements, and household goods; to do research and request cds, dvds, books, and interlibrary loans from the library; for medical, legal, ADA, and other research; for corresponding with my family and friends; to participate in webinars on fair housing issues and for PASP Cash Management Program training; to search for the best doctors; to keep in touch with my church and community and to keep in touch with my attorney.

.  .  .  .

I often use faxes when it is essential to verify that a party has received a document. This prevents me from having to send my personal assistant to the post office to send documents via certified mail.

.  .  .  .

The internet allows me to do much of my banking, shopping, research, and correspondence from home. It reduces the amount of work my personal assistants have to do outside the home and makes their errands more efficient. While I prefer to do as much as I can for myself, the PASP program, the personal assistants, and the modern communications and correspondence devices (internet, phone, fax, and cell phone) are godsends to me and assist me with being independent in spite of my multiple

11

> medical disabilities. In this age of growing dependence on multiple forms of communications technology, I would be cut off from my family, friends, community, and government programs without these essential communications and correspondence devices and services.

As these statements illustrate, access to the internet via a personal computer or a mobile handheld device is a ubiquitous characteristic of modern life and an indispensable means of efficiently conducting a variety of personal activities. Most importantly from a disabled person's perspective, this technology provides an unparalleled level of personal autonomy and privacy. Despite their best intentions, by their very involvement third-party personal assistants inevitably intrude into a disabled person's most profoundly and uniquely personal matters. Modern technological advancements, especially in the field of communication, has provided and continues to enhance the means to permit a disabled person to carry out a variety of highly personal activities independently, without having to share intimate details of his or her life with strangers hired by a government agency.

## II

Our scope of review of an administrative agency's final determination is limited. In re Carter, 191 N.J. 474, 482 (2007). We "may reverse only if we conclude that the decision

12

of the administrative agency is arbitrary, capricious or unreasonable, or is not supported by substantial credible evidence in the record as a whole." J.D. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000) (citations omitted).

"The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div.), certif. denied, 188 N.J. 219 (2006); see also Barone v. Dep't of Human Servs., 210 N.J. Super. 276, 285 (App. Div. 1986), aff'd, 107 N.J. 355 (1987). Our role as an appellate court is to ensure the decision is based on substantial evidence and supported by the record. In re Carter, supra, 191 N.J. at 483 (citation omitted). While an agency's expertise in the area is given great respect, the appellate court is not bound by an agency's decision. Ibid. (citation omitted).

Here, the Division denied L.R.'s funding request based on its interpretation of what the Legislature intended when it established the cash management model as an alternative means of providing assistance to PSAP consumers. Because questions of statutory interpretation are purely legal, our standard of review is de novo. Maeker v. Ross, 430 N.J. Super. 79, 86 (App.

Div. 2013).  The Supreme Court has recently reaffirmed the legal

principles that must guide a court in interpreting statutory

provisions:

> The chief aim when interpreting a law is to
> determine and give effect to the
> Legislature's intent.  To do so, courts look
> first to the plain language of the statute.
> If the language is clear, the court's job is
> complete.  If the wording of a law is
> ambiguous, a court may examine extrinsic
> evidence for guidance, including legislative
> history and committee reports.
>
> Statutes must also be read in their
> entirety; each part or section should be
> construed in connection with every other
> part or section to provide a harmonious
> whole.
>
> [In re Expungement D.J.B., ___ N.J. ___,
> ____ (2014) (slip op. at 8) (internal
> citations and quotation marks omitted).]

The Legislature established the PASP

> to assist adults with permanent physical
> disabilities in the performance of routine,
> nonmedical tasks that are directly related
> to maintaining their health and
> independence, in order to enable these
> persons to be employed or receive training
> or education related to employment,
> parenting, or volunteering, or to support
> community-based independent living. The
> program shall seek to promote the greatest
> possible degree of self-control and self-
> direction on the part of each recipient of
> services.
>
> [N.J.S.A. 30:4G-15 (Emphasis added).]

This overriding public policy is also reflected in the regulations promulgated by the Commissioner. N.J.A.C. 10:140-1.1; N.J.A.C. 10:140-1.3. Indeed, both sides of this dispute agree that when it amended the Act in 2009 to create the cash management plan, the Legislature intended to provide PASP consumers with greater flexibility in determining what personal services best suited their individual needs and enhance their control over how to spend the funds allocated to their monthly cash management budget.

The Division concedes that the cash management plan allows consumers to use "unspent funds for meeting daily needs for personal care, consistent with the program's regulations." It nevertheless maintains that it "is not obligated to allow program funds to be used for other expenses." (Emphasis added.) Implicit in this key policy statement, is the assumption that the type of expenses L.R. requests funding for are not for her "personal care." Division regulations do not define the term "personal care." However, the Legislature intended that PASP funds be used "to promote the greatest possible degree of self-control and self-direction on the part of each recipient of services." N.J.S.A. 30:4G-15.

The only difference between a wheelchair, a wheelchair lift, a check printing machine, and emergency alert service

devices and internet and fax access and cellular phone service is the level of technological sophistication. We discern no rational basis to support the Commissioner's decision to discriminate against technological advancements in communications that enhance and promote the independence of disabled consumers by encouraging self-reliance and protecting the dignity inherent in personal privacy.

Indeed, using a cellular phone is a far better means of summoning first responders to a medical or other personal emergency than a blunt generic distress signal emitted from an emergency alert device. A computer connected to the internet puts a virtually limitless world of information and resources at the fingertips of a disabled person. Internet access enables the PASP participant to manage his or her personal financial affairs through online banking, without the need to print and mail checks. By allowing PASP participants the opportunity to win the daily battles of personal independence through the use of these devices, the Division would have fulfilled its core mission "to promote the greatest possible degree of self-control and self-direction on the part of each recipient of services." N.J.S.A. 30:4G-15. Unfortunately, the Division opted to construe the Act in a manner that runs counter to these principles.

Equally disturbing to us is the Division's construction of the cash management model to permit consumers to use unspent PASP funds to purchase items such as wheelchairs, wheelchair lifts, emergency alert service devices, and check printing machines, while disallowing expenditures to provide access to modern communication and information management technology. No reasonable person would dispute the notion that doing for one self is always far better than having to rely on the good will of others.

The PASP is grounded in the salutary notion of promoting self-reliance for all eligible consumers. For those consumers who have been forced to rely on personal assistants to carry out basic banking functions, accessing their personal banking accounts to thereafter conduct financial transactions online can be a profound, liberating experience. We have no doubt that this is the type of experience the Legislature intended to promote when it adopted the Act.

By upholding the Division's decision to deny L.R.'s request to use the unspent part of her PASP budgeted funds in the fashion described here, the Commissioner endorsed an approach utterly irreconcilable with the public policy underpinning the Act. N.J.S.A. 30:4G-15. We therefore reverse the Commissioner's decision as arbitrary, capricious, and

17                                                    A-5701-11T2

inconsistent with the Legislature's policy of promoting the greatest possible degree of self-control and self-direction on the part of consumers of PASP services.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5701-11T2