**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0282-20

IN THE MATTER OF MARISHA
PENN, HUDSON COUNTY,
DEPARTMENT OF FAMILY
SERVICES.

_____

Submitted April 4, 2022 – Decided July 25, 2022

Before Judges Sumners and Petrillo.

On appeal from the New Jersey Civil Service Commission, Docket No. 2019-585.

Limsky Mitolo, attorneys for appellant Marisha Penn (Merick H. Limsky, on the brief).

Chasan Lamparello Mallon & Cappuzzo, PC, attorneys for respondent County of Hudson, Department of Family Services (Cindy Nan Vogelman, of counsel and on the brief; Priscilla E. Savage, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Debra A. Allen, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Marisha Penn appeals the final agency decision of the Civil Service Commission (Commission), which adopted the administrative law judge's (ALJ) initial decision, terminating her employment from the Hudson County Department of Family Services (HCDFS). The Commission determined Penn should be terminated because she tried to persuade her subordinate, Minerva Martinez, not to file a report that a co-worker, Alba Schwarz, forged Martinez's signature to approve Medicaid budget benefits for an ineligible recipient. Penn contends the Commission's decision was arbitrary, unreasonable, and capricious, and, alternatively, the evidence did not support her termination under the doctrine of progressive discipline. We affirm because we conclude there was credible evidence in the record to support the Commission's decision.

I

In a final notice of disciplinary action, Penn was found to have committed three violations of the New Jersey Administrative Code: incompetency, inefficiency, or failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); and neglect of duty, N.J.A.C. 4A:2-2.3(a)(7).[1] The penalty imposed was removal from employment

---

[1] A preliminary notice of disciplinary action also charged Penn with other sufficient causes, N.J.A.C. 4A:2-2.3(a)(12), to warrant her termination. The charge was dismissed following an administrative hearing.

effective August 13, 2018. Penn appealed her termination to the Commission, which transferred the matter to the Office of Administrative Law (OAL) as a contested case.

During a six-day hearing over diverse dates from July 2019 to January 2020, the ALJ heard the testimony of five witnesses, including Penn, concerning the allegations against Penn. The hearings revealed that on Friday, February 9, 2018, Martinez informed a HCDFS supervisor that her purported signature approving a recipient's Medicaid benefits budget was forged. Schwarz, who worked with Martinez in the Medicaid Redetermination Unit, subsequently confessed to Martinez that she forged Martinez's signature on the budget. It was later determined that the budget approved Medicaid benefits for Schwarz's ineligible neighbor.

After Penn, Martinez's supervisor was made aware of the forgery, she called Martinez that evening at the end of the workday while Martinez was driving. Their conversation was inadvertently recorded by the bluetooth device in Martinez's car connected to her cell phone (hereinafter "the phone conversation").

In discussing the forgery, Martinez was "angry," "irate," and "upset," and stated she would file a report concerning the situation. In response, Penn stated:

> Listen[,] [Schwarz is] bawling her eyes out . . . .

 A-0282-20

. . . .

I'm not defending [Schwarz].  But I'm asking, I'm asking for us to have a meeting on Monday with Debbie [Piccariello].

. . . .

I ask—this is me you're talking [to].  Can we just make it go away?

. . . .

Okay, no.  Let me ask you.  I'm trying to make deals here.

. . . .

I told her, I said, you [unintelligible] got to fix it.  So[,] I said, look, I'll see you, 'we've got to talk with a closed door.  You've got to fix it.  Go ahead.

. . . .

I just 'don't—okay, 'I'm just asking you.  I 'don't know what the deal with [unintelligible] is.  I 'don't know what the discipline will be.

. . . .

So[,] what if she do you[r] . . . [administrative] [review] for three months?

. . . .

So even if we have a meeting, we're still going to do it—do that [file the report]?

A-0282-20

When Martinez returned to work on February 13, she filed a formal written report regarding the forgery which prompted the agency's investigation. According to HCDFS Director Robert Knapp, the decision to investigate a report or defer it to law enforcement is only made after an employee submits a formal written report.

After Martinez filed her report, Penn shared Instagram posts that Martinez felt were aimed at her. The posts stated: "[t]hrow me to the wolves and I'm going to come back leading the pack"; "[d]on't open Pandora's box unless you are ready! Be sure you are ready . . . goodnite!"; and "[n]ot under my watch!"

Penn also prepared a report, stating:

> Today [February 13] I came to work and was made aware of an incident that transpired on Friday while I was out sick involving a forged budget. . . . Ms. Martinez is accusing Ms. Schwarz[] of forging her signature, but I am unable to verify anything because I have not seen the budget for myself.

In the ensuing administrative investigation, Martinez stated that Penn was "harassing her not to make a complaint against . . . Schwarz." On the other hand, Penn asserted she "was not speaking to [Martinez] as a supervisor" during the phone conversation. She told the investigator she did not "remember" if she asked Martinez about the situation or influenced her decision to file a report, and she did not "recall" if she tried to give Martinez advice between February 9

5

and February 13 regarding the alleged forgery. Penn also stated Martinez "signed her own name" on the budget, on which Penn believed Martinez and Schwarz collaborated on together.

Upon receiving and listening to the phone conversation recording, the investigator felt "Martinez was being pressured by . . . Penn not to file a complaint," and "tend[ed] to agree with Martinez" that Penn was harassing her. Hence, he recommended that "Penn . . . [be] subject to disciplinary action." In addition, Martinez obtained a cease-and-desist personnel order against Penn based on allegations that Penn was making harassing comments towards her, creating a "difficult" and "hostile" work environment.

Penn testified that Martinez was very upset about the forgery, and she—Penn—was simply trying to calm Matrtinez down and diffuse the situation so Schwarz would not lose her job, because Penn did not believe Schwarz forged Martinez's signature. Penn also said the administrative review comment was a joke, and she believed Martinez knew it was a joke. Penn contended she and Martinez were friends, and she took Martinez to file a report of the alleged forgery on February 13, and wrote her own statement about the incident. Penn testified that she "unofficially" learned about the forgery on February 9, but she "officially" learned about it the following Tuesday when Martinez filed her complaint.

6

Penn maintained her belief that Martinez agreed to help Schwarz in assisting Schwarz's neighbor get Medicaid benefits. She stated that a disagreement between Martinez and Schwarz caused them to expose each other. She also alleged Martinez signed the Medicaid budget but tried to disguise her signature.

After considering the evidence and the parties' post-hearing submissions, the ALJ issued an initial decision recommending to the Commission that Penn's termination be upheld. The ALJ found that the phone conversation was "official" in nature, and Penn's characterization of it as "unofficial" because she was not at work was "a distinction without a difference." He further found that, contrary to Penn's testimony that her comments were a joke to calm Martinez down, Penn's suggestion that Schwarz do Martinez's administrative reviews for a few months, when taken in context, was a bribe offered "to entice [Martinez] to ignore her duties as a conscientious employee." Additionally, he found that Penn sent Martinez harassing text messages and made threatening Instagram posts in retaliation for Martinez filing the report. The ALJ found that Penn's harassment and attempts to dissuade Martinez from reporting the forgery was "conduct that [was] detrimental to the morale, efficiency[,] and financial integrity of the HCDFS."

A-0282-20

The ALJ determined that Penn had a duty to immediately report Martinez's forgery allegations, but she instead "took affirmative steps to interfere with and stop the reporting of the incident to the proper authorities." He also found it was clear from the phone conversation that "Schwarz had admitted to Penn that [she] had forged Martinez's name on the [Medicaid] budget," so there was "no reason to believe Penn's allegation that Martinez and Schwarz were in collaboration" on the budget.

The ALJ concluded the HCDFS met its burden of proving the charges by a preponderance of the evidence and that Penn's actions were sufficient to warrant her termination "without regard to progressive discipline." The Commission, upon conducting an independent review of the record and reviewing Penn's exceptions and the HCDFS's reply, issued a final agency decision accepting and adopting the ALJ's findings of fact and conclusions of law, and affirmed Penn's termination.

## II

On appeal, Penn argues the Commission's decision was arbitrary, capricious, and unreasonable because it was based "almost entirely" upon a "surreptitiously recorded" unofficial phone conversation "in violation of the Hudson County Employee Handbook" that was between "friends" in an "informal setting" as evidenced by Martinez's use of profanity and racist

derogatory terms. She further contends the finding that she was attempting to bribe Martinez and take over the investigation was "incredible," and the "premise that [she] had the power to somehow make [the forgery] incident go away is [too] ridiculous to even consider." She further asserts that the phone conversation "does not establish by a preponderance of the evidence that . . . [she] tried to hide anything from her supervisor," and, therefore, the charges should be dismissed. Finally, Penn argues that, even if her actions did not comply with the Civil Service regulations, since she did not "commit the underlying offense"—the forgery—and only had a "minor disciplinary history," her conduct "do[es] not support the harsh penalty of termination."

Based on our review of the record and applicable law, Penn's contentions lack sufficient merit to warrant extensive discussion in a written opinion. R. 2:11-3(e)(1)(D) and (E). We therefore affirm substantially for the reasons stated by the ALJ in his cogent initial decision and adopted by the Commission. We add the following brief comments.

We see no reason to conclude the Commission's decision was arbitrary, capricious, unreasonable, or not supported by credible evidence in the record. See N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 384-85 (2008). Penn cites no law to support her contention that the ALJ and Commission should not have relied on the phone conversation; thus it

was properly admitted into the record. The Hudson County Handbook neither supersedes our rules of evidence nor restricts an ALJ from considering the phone conversation in deciding Penn's disciplinary action. Penn's contention that the phone conversation was "unofficial" in nature is equally unpersuasive. Regardless of the time of day the conversation was held, and amount of expletives Martinez stated therein, the conversation was between a supervisor and a subordinate related to workplace conduct. Even considering Penn's contention regarding the comment that Schwarz perform Martinez's administrative review for two months was a joke, the ALJ reasonably dismissed it because Penn was acting in her official capacity and suggested she could arrange a meeting at work to minimize the damage to Schwarz's employment. Moreover, there was credible evidence outside of the phone conversation to support the HCDFS's charges based upon the testimony of Martinez, Penn, and the other witnesses. Accordingly, the Commission's determination that Penn was acting in her official capacity and attempted to improperly persuade Martinez not to report Schwarz's forgery was supported by credible evidence in the record.

Furthermore, Penn's contention that the Commission's decision was arbitrary, capricious, and unreasonable because she did not have the power to impede an investigation that was reported to other supervisors is also meritless.

A-0282-20

Knapp testified that the decision to investigate the complaint or defer it to law enforcement is only made after an employee submits a formal written report. Consequently, the fact that other supervisors were made aware of the allegation does not mean that an investigation would automatically result. As Knapp testified, while he was made aware of the allegations the day they arose, the investigation was initiated only after Martinez submitted her written report the following Tuesday. Therefore, Penn did have the power to prevent the investigation from happening when she spoke with Martinez. Yet, even accepting the impossibility of Penn impeding the investigation does not negate her attempt to do so nor undermine the Commission's findings.

The Commission's determination that Penn's misconduct warranted termination rather than some lesser form of discipline was not arbitrary, capricious, and unreasonable. Our Supreme Court has held that "progressive discipline is not a necessary consideration when reviewing an agency head's choice of penalty when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for continuation in the position." In re Herrmann, 192 N.J. 19, 33 (2007).

The Commission determined that Martinez's signature was forged on a Medicaid budget to misappropriate government funds. As a public employee charged with supervising the administration of public benefits, Penn had the

duty to support and protect Martinez, her subordinate, who needed to report the forgery to prevent the illegal use of public funds. Even if Martinez was not interested in filing a formal report, the severity of the allegations dictated Penn should have sought an investigation into the forgery once it was brought to her attention. Penn's termination was not "so disproportionate to the offense, in . . . light of all the circumstances, as to be shocking to one's sense of fairness." In re Carter, 191 N.J. 474, 484 (2007) (internal quotations marks omitted). Hence, the Commission's determination that Penn's conduct was severe enough to warrant termination was consistent with law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0282-20