**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3936-16T3

KYHEEM DAVIS,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

TOWNSHIP OF NEPTUNE,

      Defendant-Appellant/
      Cross-Respondent.

_____

      Argued October 10, 2018 – Decided  January 16, 2019

      Before Judges Yannotti, Gilson and Natali.

      On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-3221-15.

      Jonathan F. Cohen argued the cause for appellant/cross-respondent (Plosia Cohen LLC, attorneys; Jonathan F. Cohen, of counsel and on the briefs).

      Marcia J. Mitolo argued the cause for respondent/cross-appellant (Limsky Mitolo, attorneys; Marcia J. Mitolo, of counsel and on the briefs).

PER CURIAM

Defendant Township of Neptune (Township) appeals from a January 26, 2017 Law Division order setting aside a ninety-day suspension imposed upon plaintiff Kyheem Davis, a Township police officer, and a May 12, 2017 order which denied its motion for reconsideration.[1]  Plaintiff cross-appeals from the court's May 12, 2017 order denying his application for back pay and attorney's fees.  We reverse those portions of the January 26, 2017 and May 12, 2017 orders related to plaintiff's suspension, reinstate the hearing officer's decision to suspend plaintiff for ninety days without pay, and dismiss the cross appeals.

I.

We briefly summarize the relevant facts and procedural history.  Since November 2000, plaintiff has been employed by the Neptune Township Police Department (Department) as a police officer.  On February 6, 2015, the Department charged Davis with violating three Department Rules and Regulations related to his response to a December 14, 2014 fatal motor vehicle accident.  Specifically, the Department alleged plaintiff violated Rule 3.1.1,

_____

[1] The January 26, 2017 order also upheld plaintiff's three-day suspension related to a March 30, 2015 incident when he lost a suspect's iPhone during the course of an arrest.  Plaintiff has not appealed his suspension related to the March 30, 2015 incident.

"Performance of Duty"; Rule 3:7.10, "Relief"; and Rule 3:9.10, "Operation of Departmental Vehicles."[2]   The Department maintained that plaintiff failed to "operate [his] assigned patrol vehicle in a safe manner and in conformity with State law and departmental written directives," neglected to "complete a thorough [d]aily [a]ctivity [l]edger to include all necessary information," and did not remain in his assigned patrol zone.

The Department initially sought a fifteen-day suspension.   Plaintiff rejected that proposed penalty and pleaded not guilty to the charges.   On May 1, 2015, a disciplinary hearing was conducted.

Plaintiff testified that on December 14, 2014, he was on duty and assigned to patrol zone six[3] from 7 a.m. to 3 p.m.   He stated that he agreed to pick up

---

[2]   Rule 3.1.1 requires all police officers to "promptly perform their duties as required or directed by law, rules and regulations or written discovery, or by lawful order of a superior officer."   Rule 3.9.10 provides that when "operating department vehicles, employees shall not violate traffic laws, except in cases of emergency and then only in conformity with state law and department written directive . . . ."   Rule 3:7.10 mandates that all officers "remain at their assignments and on duty until properly relieved by other employees or until dismissed by competent authority."

[3]   The Department divided the Township into six zones.   Officers are assigned to specific zones to ensure they are in close proximity to any incident within the Township.

breakfast for Sergeant Gonzalez and another officer from Carmela's Restaurant, located in zone five, which is adjacent to zone six.

At approximately 8:28 a.m., plaintiff received a call from a dispatcher informing him of an emergency motor vehicle accident on Route 66, which is within zone six. Patrol Officer John Jackson arrived at the scene and requested assistance. Plaintiff was not informed at this time that the accident involved a fatality. He responded at approximately 8:30 a.m. that he was on his way. Footage from the mobile video recorder (MVR)[4] in plaintiff's patrol car showed him leaving his residence, located in zone two, at approximately 8:29 a.m. According to the radio log, which lists all dispatcher and officer transmissions, and as corroborated by his MVR footage, one minute and fifty-four seconds passed between plaintiff responding to the dispatcher's call and when he activated his emergency lights.

It took plaintiff three minutes and fifty-five seconds to reach the accident scene. While en route, plaintiff drove at highly accelerated speeds, reaching 131 miles per hour (m.p.h.) at one point. Despite traveling in this manner, plaintiff was the third officer to arrive.

---

[4] All Department police vehicles are equipped with a MVR. The MVR starts when an officer activates the vehicle's emergency lights and begins recording thirty-seconds prior to activation.

A-3936-16T3

Plaintiff testified that after he picked up breakfast, he noticed the restaurant failed to provide him with a spoon. As his home was between Carmela's Restaurant and police headquarters, he decided to stop at his house to retrieve a spoon. Plaintiff stated that he received the emergency call as he was arriving at his home. He explained the one minute and fifty-four second gap between responding to the dispatcher's call and when he activated his emergency lights to packing up and securing the food prior to leaving for the accident scene.

Captain Robert Mangold testified that shortly after the accident he reviewed the responding officers' MVRs and "observed that [plaintiff] had driven in a reckless manner responding to the [accident]." He stated that the safe speed to operate a vehicle depends on the "date, time, weather [and] location," but "[i]n this instance . . . [he] d[idn't] see any reason" for plaintiff to drive at a speed of "over a hundred [m.p.h.]."

Captain Mangold discussed plaintiff's conduct with Sergeant Elena Gonzalez who prepared a report confirming that plaintiff "reach[ed] a speed of up to 131 [m.p.h.]." She testified that Captain Mangold advised her to recommend the Department investigate plaintiff for violating Rules 3:7.10, 3.9.10 and Rule 3:7.14(1) for "idling at his residence while on duty" and Rule

3:9.4 for "failing to care for departmental equipment . . . by operating the vehicle in a reckless manner."

Sergeant Gonzalez testified that she did not give plaintiff permission to go to his home. She acknowledged that she never drove a police vehicle in excess of 110 m.p.h., or 131 m.p.h., because she was concerned for her safety as well as the safety of other officers and the public.

After Captain Mangold's and Sergeant Gonzalez's review, Lieutenant Michael McGhee initiated an internal affairs investigation in which he "compil[ed] reports, videos, and sp[oke] with other officers." He testified that he interviewed plaintiff, who "didn't appear concerned or apologetic" about his actions.

Lieutenant McGhee concluded that plaintiff was untruthful in his interview. He testified that plaintiff told him that he had been riding around zone six prior to getting breakfast. However, he stated that plaintiff was unable to provide "any specific locations" in zone six where he patrolled and "[d]id not recall where he was driving in the zone." Having consulted the mileage history on plaintiff's vehicle, Lieutenant McGhee found plaintiff's story that he spent time patrolling zone six "[n]ot entirely" credible.

A-3936-16T3

Lieutenant McGhee also questioned plaintiff's claim that he returned home to get a spoon for breakfast, but never made it inside his house, got the spoon or even "stepped out of his vehicle." Lieutenant McGhee noted the delay between the time when plaintiff received the call at 8:28:40 a.m. and when he activated his MVR, which Lieutenant McGhee determined did not occur until approximately 8:30:15 a.m. According to Lieutenant McGhee, plaintiff's explanation for his activities between the time he left police headquarters and when he left his house to respond to the accident was hard to believe given the "minute and [fifty-four second] gap." Furthermore, Lieutenant McGhee testified that there are spoons located in the police department.

Lieutenant McGhee explained that "[h]ad [plaintiff] been . . . anywhere in his zone, even traveling . . . under emergent circumstances, [he] would [not] have gotten to that high of a speed." Based upon his investigation, Lieutenant McGhee recommended that plaintiff be cited for violating Rules 3:7.10 and 3:9.10.[5]

Chief of Police James M. Hunt, Jr., testified that plaintiff violated Rule 3:1.1, because he was "trained in abiding by the rules and regulations . . . and

___

[5] Lieutenant McGhee did not recommend charging plaintiff with violating Rule 3:7.14(1), and the February 6, 2015 Notice of Charge and Hearing did not charge plaintiff with violating either Rule 3:7.14(1) or Rule 3:9.4.

he failed to adhere to them [by] driving recklessly [at a speed] of [131] miles [per] hour to a fatal motor vehicle accident." With respect to Rule 3.7.10, Chief Hunt stated that plaintiff went to his home without permission and noted the unexplained minute and fifty-four second time gap between the time he left his home and activated his lights. Chief Hunt also testified that plaintiff violated Rule 3:9.10 by driving one "hundred thirty one miles an hour down a state highway . . . [exhibiting a] reckless disregard for . . . his own life and [the life of] others."

Chief Hunt also explained that the Department promulgated a standard operating procedure entitled "Vehicle Operation and Response Guidelines" that addressed the appropriate protocol for responding to emergencies. The directive explained that "no matter how urgent the response" plaintiff was required to operate his vehicle in a "safe and controlled manner . . . while taking into consideration the characteristics of the roadway, mechanical capabilities of the vehicle, weather conditions, and the potential actions of other citizens." The written procedure advised all police officers that the "first priority of a call response is to arrive safely at the scene with minimal disruption to the public."

At the hearing, the Township also introduced evidence regarding plaintiff's extensive history of traffic accidents and driving-related infractions. We briefly summarize that evidence.

On November 2, 2004, plaintiff was verbally reprimanded after his involvement in a one-car collision when, due to his inattentiveness, he "sideswiped a traffic control barrel," breaking the glass on the passenger side mirror of his patrol car. As a result of the accident, the Department recommended that plaintiff "attend a driver improvement course."

On July 30, 2005, the Department issued plaintiff a second verbal reprimand for inattentive driving when he backed his patrol car into a Department police vehicle causing property damage to both vehicles. Plaintiff was "lecture[d] on the need to pay close attention while driving so there is no repeat of this type of incident."

On September 17, 2005, plaintiff "failed to negotiate [a] curve on the highway and his vehicle struck the curb," causing "damage to the driver side front wheel and rim" so significant the vehicle needed to be towed because the "front left wheel was locked up." The Department attributed the cause of the accident to the wet roadway and plaintiff's failure "to maintain proper control of the patrol vehicle while responding to a call."

A-3936-16T3

Because it was plaintiff's third motor vehicle accident within twelve months, and there was the "potential for serious injury to him or others without corrective action," the Department: 1) "assigned [plaintiff] to attend a driver improvement course;" 2) required him "to watch selected training videos geared towards instruction on safely operating emergency vehicles;" 3) assigned plaintiff to a field training officer for three nights for "further instruction on the proper techniques of emergency vehicle operation;" and 4) placed a written reprimand in plaintiff's personnel file.

On November 28, 2006, "plaintiff struck a legally parked vehicle while responding to an emergency call," causing "a chain reaction that resulted in two privately owned vehicles to be damaged in the collision . . . [with] [o]ne vehicle . . . heavily damaged." The Department concluded plaintiff "failed to maintain proper control of [his] vehicle due to excessive speed and poor judgment" resulting in a "failed response to the initial call and the requirement of other police resources to cover the accident call." The Department again concluded that without corrective action, there was "a potential for serious injury to occur."

As a result of the November 28, 2006 incident, the Department required plaintiff to be reevaluated by a "certified emergency vehicle instructor, [with] specific instruction and retraining . . . on the operation of emergency vehicles."

Plaintiff was also immediately assigned to watch training videos geared towards instruction on safely operating emergency vehicles. Plaintiff also forfeited twenty-four hours of compensatory time and a written report was placed in his personnel file.

On July 21, 2013, plaintiff rear-ended a vehicle when he "was late for a detail and was driving hastily." The investigation revealed that plaintiff "failed to maintain proper foot contact on the brake pedal causing him to lose momentary control . . . striking [the] [other] vehicle." Plaintiff was advised that he "needs to be more aware of the basic controls of [his] vehicle." He was given a two-day suspension, a thirty-day suspension for eligibility for off-duty details, and was required to review the "policies on safe operation of police vehicles with a qualified Emergency Vehicle Operator instructor."

On May 3, 2014, plaintiff rear-ended another car when he incorrectly assumed the vehicle had turned. The internal affairs investigation report attributed the "cause of the accident to . . . [plaintiff's] inattention," and also noted plaintiff failed to activate his lights immediately after the accident. Plaintiff pleaded guilty to failing to operate his police vehicle in a safe manner

and neglecting to activate his MVR. He accepted the recommended four-day suspension.[6]

In his August 12, 2015 written decision, the hearing officer concluded that plaintiff violated Rules 3:1.1, 3:9.10, and 3:7.10 and, after considering plaintiff's prior disciplinary history, recommended a ninety-day suspension without pay. The hearing officer determined Captain Mangold, Lieutenant McGee, and Chief Hunt to be credible witnesses and noted that both Lieutenant McGee and Chief Hunt found plaintiff's explanation for the one minute and fifty-four second gap to be dishonest. In this regard, the hearing officer explained that plaintiff "could not explain the missing minute and [fifty-four] seconds . . . , how long he was in [z]one [six] prior to getting breakfast, or what he was doing in his driveway except 'securing grits.'"

Plaintiff filed a verified complaint seeking to reverse the ninety-day suspension and the three-day suspension for the March 30, 2015 incident involving the loss of a suspect's iPhone. On January 26, 2017, after hearing oral

---

[6] Plaintiff was also involved in another motor vehicle accident in his patrol car on December 3, 2012, but the Township concedes that because plaintiff failed to activate his MVR, there was insufficient evidence to establish plaintiff's fault. In the Department's written reprimand, it noted that plaintiff failed to report the incident and he "used poor judgment [by] not using the assigned tools to his advantage (MVR) and in doing so allowed himself and the Township of Neptune to be liable to litigation."

arguments, the court entered an order vacating plaintiff's ninety-day suspension and affirming his three-day suspension.

In its written decision, the court concluded that the "record lack[ed] sufficient and competent evidence to support the charges" related to the December 14, 2014 incident. The court noted that plaintiff had permission to leave his zone to purchase breakfast and took the more expedient route to his residence to retrieve a spoon and secure the food, rather than returning to Carmela's. The court further explained that because plaintiff was responding to an emergency and "did not run any lights [or] roll over any stop signs," he did not violate Rule 3:9.10. Finally, the court stated that without a clear written policy that excessive speed is sufficient to establish recklessness, it could not conclude that driving at 131 m.p.h., was per se reckless. On this point, the court compared plaintiff's actions when speeding to the scene to the actions of the two other responding officers, and noted that they also traveled at high rates of speed.

On February 8, 2017, plaintiff filed a motion for attorney's fees and back-pay and defendant cross-moved for reconsideration of the court's January 26, 2017 order. Plaintiff contended that because the ninety-day suspension and three-day suspension arose from two separate disciplinary complaints, he was

 A-3936-16T3

entitled to attorney's fees and back pay as to the vacated ninety-day suspension. On May 12, 2017, after hearing oral arguments, the court placed its oral decision on the record and entered an order denying both motions. These appeals followed.

## II.

The Township raises two primary arguments on appeal. First, relying on In re Carter, 191 N.J. 474, 486 (2007), it asserts that the court failed to consider the substantial evidence before the hearing officer supporting plaintiff's guilt and "second guess[ed]" the Township's administrative officers, who based their testimony on decades of experience as Department police officers. Second, the Township maintains that the court failed to afford appropriate consideration to plaintiff's pervasive driving-related disciplinary history.

In his cross-appeal, plaintiff asserts that the court committed error in denying his application for attorney's fees. He argues that although his three-day suspension for the March 30, 2015 incident was upheld by the court, it arose from a separate disciplinary complaint, and he should therefore be considered a prevailing party with regard to his ninety-day suspension. Finally, plaintiff maintains that the court's denial of his request for back pay was in error because the court's May 12, 2017 order denying reconsideration was the final judgment

of the court, and he filed a timely motion for back pay within thirty days of receiving that order.

## III.

As the Township is a non-civil service jurisdiction, the statutory framework for disciplinary proceedings against police officers is governed by N.J.S.A. 40A:14-147 to -151. Ruroede v. Borough of Hasbrouck Heights, 214 N.J. 338, 343 (2013). That statutory scheme requires the Township to show "just cause" for any suspension, termination, fine, or reduction in rank. Id. at 354 (citing N.J.S.A. 40A:14-147).

An officer is entitled to a hearing and if convicted of any charge, may obtain review in the Superior Court. Id. at 355; N.J.S.A. 40A:14-150. "The court shall hear the cause de novo on the record below and may either affirm, reverse or modify such conviction." Ibid. The trial court must, however, make its own findings of fact. Id. at 357 (citing In re Disciplinary Proceedings of Phillips, 117 N.J. 567, 578 (1990)).

The trial court must provide "an independent, neutral, and unbiased" review of the disciplinary action, ibid. (citing Phillips, 117 N.J. at 580), and although it should give deference to the hearing officer's conclusions regarding credibility, "those initial findings are not controlling." Id. at 357 (quoting

15                                                                                    A-3936-16T3

Phillips, 117 N.J. at 579).  The court must "make reasonable conclusions based on a thorough review of the record."  Ibid. (quoting Phillips, 117 N.J. at 580).

When considering the penalty the municipality imposed upon an officer, a court asks "whether such punishment is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Carter, 191 N.J. at 484; In re Herrmann, 192 N.J. 19, 28-29 (2006).  The trial court may modify, but not increase or enhance the penalty.  Cosme v. Borough of E. Newark Twp. Comm., 304 N.J. Super. 191, 201-02 (App. Div. 1997).

An appellate court's role in reviewing the de novo proceeding is "limited." Phillips, 117 N.J. at 579.  We "must ensure [that] there is 'a residuum of legal and competent evidence in the record to support'" the court's decision.  Ruroede, 214 N.J. at 359 (quoting Weston v. State, 60 N.J. 36, 51 (1972)).  We do not make new factual findings, but merely "decide whether there was adequate evidence before the . . . [c]ourt to justify its finding of guilt."  Phillips, 117 N.J. at 579.  "[U]nless the appellate tribunal finds that the decision below was 'arbitrary, capricious[,] unreasonable[,]' or '[un]supported by substantial credible evidence in the record as a whole,' the de novo findings should not be disturbed."  Ibid.  On the other hand, we do not defer to the trial court's legal conclusions.  Cosme, 304 N.J. Super. at 203 (citing Manalapan Realty, L.P. v.

16

Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).  Like the trial court, we will reverse any penalty disproportionate enough to "shock[] one's sense of fairness."  Carter, 191 N.J. at 484 (quoting In re Polk License Revocation, 90 N.J. 550, 578 (1982)).

After thoroughly reviewing the record in light of these legal principles and the standard of review, we conclude that the court's decision vacating the ninety-day suspension was arbitrary and capricious and not supported by the "substantial credible evidence in the record as a whole."[7]  With respect to Rule 3:9.10, the court relied on its review of plaintiff's MVR, and stated that plaintiff "had full control of his vehicle[,] . . . did not run any lights, [and did not] roll over any stop signs."  However, the recording actually supports the Department's and hearing officer's conclusion that plaintiff violated Rule 3:9.10 and the "Vehicle Operation and Response Guidelines" as he did not "operate [his] [D]epartment vehicle[] in a safe and controlled manner at all times."

---

[7] The court did not address the hearing officer's finding that plaintiff violated Rule 3:1.1.  Instead, the court focused on the violations discussed in the Department's internal affairs investigation, including Rules 3:7.14 and 3:9.4, which were not included in the Department's February 6, 2015 Notice of Charge and Hearing.  Based upon Chief Hunt's testimony that plaintiff was trained to abide by Department rules and regulations and "failed to adhere to them [by] driving recklessly," we conclude there was substantial evidence in the record to support the hearing officer's finding that plaintiff violated Rule 3:1.1.

A-3936-16T3

For example, after backing his vehicle out of his driveway, plaintiff drove through two stop signs in a residential area, the second time while driving 36 m.p.h. The MVR footage also shows plaintiff rapidly picking up speed, reaching 111 m.p.h., and tailgating a pick-up truck at 84 m.p.h., before crossing a double-yellow line. After the pick-up truck moved to the right lane to avoid plaintiff's vehicle, he quickly accelerated to 131 m.p.h. As he approached a traffic light that had just changed from red to green, plaintiff crossed another double-yellow line traveling at 53 m.p.h. to bypass three cars stopped at the intersection. Plaintiff then passed two cars in the right lane at a green light and made a right turn at an intersection from the left lane, at 43 m.p.h. Plaintiff accelerated to 80 m.p.h. in a residential 25 m.p.h. zone and was observed crossing a double-yellow line and driving on the wrong side of the road. Finally, plaintiff rolled through a red light at 38 m.p.h. before arriving at the accident scene.

Based on these facts, the trial court's conclusion that plaintiff "had full control of his [car]" and did not "operat[e] the vehicle in a reckless manner" is mistaken and contrary to the evidence. The court's statements that plaintiff never drove through a stop sign is clearly erroneous, as evidenced by the first minute of the MVR footage. Additionally, plaintiff's repeated crossing of

18

double-yellow lines and tailgating a pick-up truck at an excessive speed and driving in excess of 100 m.p.h. while facing oncoming traffic and in an area with homes and businesses cannot be considered "safe and controlled."

With respect to Rule 3:7.10, the court's finding that plaintiff was permitted to leave his assigned zone is similarly erroneous. Though the court correctly noted plaintiff had permission to "leave his assigned zone . . . to pick[] up breakfast," he was not authorized to go to his home to pick up a spoon, or for any other reason.

Finally, in light of these violations, and plaintiff's extensive disciplinary history, the hearing officer's decision to suspend plaintiff for ninety days was appropriate and consistent with the doctrine of progressive discipline. The goal of progressive discipline is "to promote proportionality and uniformity in the rendering of discipline of public employees." In re Stallworth, 208 N.J. 182, 195 (2011). The doctrine is employed "(1) to 'ratchet-up' or 'support imposition of a more severe penalty for a public employee who engages in habitual misconduct;' and (2) 'to mitigate the penalty' for an employee who has a record largely unblemished by significant disciplinary infractions." Id. at 196 (quoting Herrmann, 192 N.J. at 30-33).

Here, plaintiff was disciplined seven times in a period of ten years for driving-related incidents, including an instance where he caused a chain collision after striking a legally parked car while responding to an emergency call. Plaintiff was found to be at fault in six of these incidents. In light of plaintiff's clear violation of Rules 3:1.1, 3:7.10, and 3:9.10, and his pervasive disciplinary history related to the operation of his vehicle, the ninety-day suspension was not so "disproportionate to the offense" such that it shocks one's "sense of fairness." Carter, 191 N.J. at 484.

In light of our decision, plaintiff is not the prevailing party and, thus, he is not entitled to back pay or attorney's fees. Accordingly, we reject his cross-appeal.

Reversed on the appeal, and remanded to the trial court for entry of an order reinstating plaintiff's ninety-day suspension without pay; the cross-appeal is dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION