**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5904-17T1

IN THE MATTER OF
ALLAN KENNEY
JUVENILE JUSTICE
COMMISSION.

_____

Argued March 2, 2020 – Decided July 16, 2020

Before Judges Rothstadt and Mitterhoff.

On appeal from the New Jersey Civil Service Commission, Docket No. 2015-2797.

Charles J. Sciarra argued the cause for appellant Allan Kenney (Sciarra & Catrambone, LLC, attorneys; Charles J. Sciarra, of counsel and on the briefs; Frank C. Cioffi, on the briefs).

Suzanne Davies, Deputy Attorney General, argued the cause for respondent Juvenile Justice Commission (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Suzanne Davies, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Civil Service Commission (Donna Arons, Assistant Attorney General, of counsel; George N. Cohen, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Allan Kenney, a former corrections officer of the Juvenile Justice Commission (JJC), appeals from the Civil Service Commission's (CSC) March 29, 2018 final agency decision. The decision adopted an Administrative Law Judge's (ALJ) January 26, 2018 recommendation, sustaining Kenney's termination from employment based upon his inappropriate physical contact with a juvenile resident. He also appeals from the CSC's August 17, 2018 decision, denying his motion to reconsider the March 29, 2018 decision.

On appeal, Kenney argues that the CSC's determination was arbitrary, capricious, unreasonable, and was not supported by substantial credible evidence in the record. In the alternative, Kenney argues that his termination should be overturned, and progressive discipline should be applied with back pay and attorney's fees. We disagree and affirm substantially for the reasons stated by the ALJ in her comprehensive written initial decision that was adopted by the CSC and in the CSC's decision rejecting Kenney's motion for reconsideration.

The facts developed at the hearing before the ALJ are summarized as follows. Prior to his termination, Kenney had been employed by the JJC since 2007 as a corrections officer. At the time of the incident, Kenney was a senior

corrections officer. Prior to the present matter, disciplinary charges were brought against him on only one occasion. In 2013, Kenney pled guilty to charges, including "incompetency, inefficiency or failure to perform duties"; "conduct unbecoming a public employee"; "neglect of duty"; and "other sufficient cause," which contained various human resource violations, one of which was falsification of his narrative report. The charges related to Kenney prohibiting a resident from changing out of his wet clothing and requiring the resident to stand in the hallway for two hours. Kenney was suspended for ninety days following the incident.

The subject incident occurred on January 12, 2014, when Kenney and Officer Andres Collazo were required to supervise the residents in a specific housing unit of the New Jersey Training School (Training School). The Training School housed approximately thirty juvenile residents who had been adjudicated for committed various crimes, including murder, sexual assault, and burglary. Residents lived in a dormitory setting and included in the housing unit was a recreational center known as the day room.

On that day, a resident was in the day room when he intentionally banged his head against the bathroom door. Officer Collazo witnessed the act, and after he informed Kenney, they spoke to the resident in the hallway. Kenney also

notified his supervisor, Sergeant Terry Fisher, as the resident seemed to be injured from hitting his head.

When the conversation with the resident began, Kenney was stationed behind a podium, however, as the conversation developed, Kenney moved in front of the podium to get closer to the resident. At one point, the resident raised his hands and took a few steps forward. After the resident moved back towards the wall, Kenney reached towards the resident and pushed him against the wall. A physical altercation then ensued, which resulted in the two falling to the ground. Kenney called an emergency code over his radio. The resident got up and headed towards the wall when he was taken down "to the ground a second time." Once Kenney subdued the resident, Sergeant Fisher responded to the call. After the resident was subdued, Kenney got up and the resident remained on the ground.

Later that same day, Kenney authored a narrative report of the incident. In the report, Kenney stated that after the resident was taken to the hallway, the resident became angry, cursed at him and Officer Collazo, he "balled his fists up," and was breathing heavily. According to Kenney, after he failed to calm down the resident, the resident "took steps toward[s]" him and Kenney ordered him to "step back and unclench his fists." At that point, the resident cursed at

Kenney and "lunged at" him. Kenney further stated that he attempted to restrain the resident, but the resident pushed Kenney to the ground and at some point, he struck Kenney in the face and head. This caused Kenney to use "a hand strike that connected with [the resident's] head," which allowed him and Officer Collazo to get the resident to the ground. According to Kenney, the resident continued to resist, leading Kenney to strike the resident's "torso and upper body with knees and hand strikes." He stated, that once the resident was subdued, the resident was placed in mechanical restraints.

Following the report, Kenney charged the resident with an assault on staff. The resident also authored a statement, indicating that Kenney "grabbed him for no reason and punched him on the back of the head during the same incident." The resident was later found guilty of committing the offense and was sanctioned to segregation for five days.

After the incident, a lieutenant of the Training School reported the incident and allegations to the Office of Investigations, which led Eric Cloud, a senior investigator for the JJC, to conduct an investigation. He investigated whether the following allegations against Kenney were substantiated: The initiation of "inappropriate physical contact against" the resident; the use of excessive force against the resident with "hand and knee strikes"; and

falsification of his report by stating that the resident "lunged" at Kenney. Cloud was also asked to investigate an allegation that Officer Collazo fabricated his report, whether the resident initiated the physical altercation against Kenney, and whether the resident assaulted Kenney. In authoring an investigative report, Cloud relied on the surveillance videos; photographs he took of Kenney and the resident; interviews of Kenney, Officer Collazo, Sergeant Fisher, and residents that were at the unit at the time of the incident; narrative reports; the resident's juvenile statement; and Kenney's prior disciplinary violation. The resident refused to be interviewed as he invoked his Miranda rights.[1]

In the report, Cloud summarized the interviews he conducted, the videos he reviewed,[2] relevant documents, and the injuries sustained. Cloud stated that Kenney's description of the incident was inconsistent with the hallway surveillance video. He stated that Kenney's allegation that the resident took two to three steps towards him and then "lunged" at him was not corroborated by the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] In his report, Cloud noted that he only reviewed the hallway surveillance video. However, during the hearing, Cloud indicated that he also reviewed the day room surveillance video and that forgetting to include that video in his report was an oversight. Cloud stated that the day room surveillance video was considered until the resident was taken into the hallway, where the physical altercation occurred.

A-5904-17T1

video. After Sergeant Fisher was called, the situation was contained, and the matter only escalated when Kenney initiated physical force against the resident. With these findings, Cloud concluded that all the allegations against Kenney were substantiated, as was the one allegation against Officer Collazo, the allegation that the resident initiated the physical violence was unfounded, and the allegation that the resident assaulted Kenney was inconclusive.

Thereafter, on March 20, 2014, the JJC served a preliminary notice of disciplinary action on Kenney, charging him with a violation of N.J.A.C. 4A:2-2.3(a)(6), conduct unbecoming a public employee; and N.J.A.C. 4A:2-2.3(a)(12), other sufficient cause, which was defined as a violation of JJC's human resource policies, identified as H19.7 C-6 inappropriate physical contact, C-9 falsification, C-12 conduct unbecoming a public employee, and N.J.A.C. 13:95-3.2's use of force policy. After the ensuing departmental hearing, a final notice of disciplinary action was served on Kenney on April 20, 2015, and Kenney was removed from his position that same day.

Kenney filed an appeal, and the matter was assigned to the ALJ for a hearing that was held on July 9, 2015. At the hearing, Cloud and Captain Edwin Gonzalez testified on behalf of the JJC. Kenney testified on his own behalf.

Cloud testified that he was responsible for investigating matters involving staff or officers on issues relating to violence, sexual assaults, and administrative cases. His investigation of the incident revealed that the resident banged his head on a door, Officer Collazo and Kenney spoke to the resident in the hallway, Kenney came "from behind [the officer's podium, went] in front of the officer's station . . . and . . . grab[bed the resident,] and they [then] start[ed] to struggle." Cloud testified that Kenney altered his account of what occurred during the interview. Specifically, while Kenney's report stated that the resident "lunged" at him, during the interview, Kenney stated that the resident's action equated more to a "flinch" than a "lunge." Cloud further testified that Kenney's account of the incident differed from the video, which was played during his testimony. He concluded that based on his investigation, the charges against Kenney were all substantiated.

Further, on cross-examination, Cloud stated that the resident did take a few steps forward, which was contrary to what was stated in his report, however, those forward steps did not take place when Kenney was reaching towards the resident. Cloud stated that the mistake in his report was merely an oversight. He reiterated that the resident never "lunged" towards Kenney. Additionally,

based on his interviews, he admitted that the resident was verbally belligerent towards Kenney, but the resident never used physical force against Kenney.

Captain Gonzalez testified about his employment history, and further testified that he was responsible for teaching the JJC employees about crisis management, use of force, and instructions on firearms. He stated that the JJC had established policies relating to the use of force on the job, and classes were provided to its employees on how to write incident reports. Captain Gonzalez testified that a JJC corrections officer was authorized to use physical force on a daily basis, however, it would be a violation for a JJC officer to use physical force "in response to a resident using . . . insulting . . . or abusive language towards [a] officer," and the force should only be used as a last resort. He further testified about the JJC's human resource polices and punishments associated with different violations.

In addition to the facts stated in his narrative report, Kenney testified about the layout of the housing unit, his responsibilities, prior training and disciplinary charge, injuries he sustained in the past, and the use of force he previously used. The surveillance videos were also played during Kenney's testimony.

 A-5904-17T1

Kenney testified that after the resident was taken into the hallway and questioned about why he banged his head against the door, Kenney informed the resident that he had to report his actions, speak to a supervisor, and the resident would need to see medical personnel. According to Kenney, this made the resident "angry and belligerent." Only after the resident became "more agitated and he was balling his fists up," did Kenney come from behind the podium, attempt to calm the resident down, and take a defensive position. Kenney testified that after he was unsuccessful in calming the resident down and the resident stepped towards him, he used physical force as he had "exhausted all other means of constructive authority and . . . verbal commands."

According to Kenney, when he engaged the resident, the resident had already caused the incident to get "beyond the point of verbal" and the resident was an "immediate threat" to his safety. He testified that after the resident pushed him down to the ground, he and Officer Collazo attempted to restrain the resident using "[h]and strikes, knee strikes and grappling and wrestling," which Kenney believed he had the authority to use. Once he was restrained and Sergeant Fisher arrived, he no longer touched the resident.

In his testimony about his report, Kenney stated that he used the word "[l]unge" to describe the resident's "sudden movement toward [him] when he

A-5904-17T1

raised his hand [and] moved his upper body towards [him] in an aggressive manner." He further stated that after he described the incident to his supervisors and colleagues, they agreed that using the word "[l]unge" to explain the resident's action was appropriate. Kenney denied attempting to mislead anyone with his report.

After considering the testimony and other evidence, the ALJ submitted a comprehensive written decision sustaining Kenney's termination from the JJC on January 26, 2018. In the decision, the ALJ found that Kenney lacked credibility, as his story did "not hang together" and "it is more likely than not that [Kenney] consulting colleagues and filing of charges [against the resident] was an intentional attempt to justify . . . action that he knew was excessive." The ALJ noted that "[w]hile [the resident] did raise his hand at one point, he did not appear to be behaving in a threatening, menacing or aggressive manner toward [Kenney], and appeared to be backing away from [Kenney], consistent with . . . [Kenney's] verbal instructions . . . ."

She also found that the use of the word "lunge" in Kenney's report was an inaccurate description of what occurred. Specifically, the ALJ stated that "the common usage of the word lunge, coupled with an objective viewing of the [hallway surveillance] video," made her "tend[] toward a finding that the event

11

had not been accurately described" to Kenney's supervisors and colleagues. Instead, if the incident had been properly explained, she stated that "at least one [person] would have noted that lunge was not the correct word" to use in Kenney's report.

In terms of the charge for unbecoming a public employee and the violation of the JJC's human resource policy C-12, the ALJ found that the charges should be sustained as Kenney initiated and "utilized physical force in his encounter" that did not "commensurate" with the actions of the resident. She further found that there was a violation of the human resource policy C-6 that prohibited "inappropriate physical contact or mistreatment of a patient, client, resident, employee or adult inmate," as Kenney initiated physical contact against the resident without justification.

The ALJ also considered whether the employer met its burden to establish that Kenney falsified his report under human resource policy C-9. The ALJ concluded that Kenney's report was "not consistent with what actually occurred," and, instead, his act of fabricating the report was in attempt to justify his actions. Finally, the ALJ found that Kenney's charge under N.J.A.C. 13:95-3.2 was substantiated as the resident "did not act aggressively or threateningly toward" Kenney, and, instead was backing away from Kenny.

Turning to progressive discipline, the judge sustained Kenney's removal as the violations arising from this incident in combination with Kenney's past violation, demonstrated his "substantive disciplinary history." The ALJ noted that the incident qualified as a second offense against Kenney for conduct unbecoming and for falsification. The remaining charges were his first offense of such a type. After considering the totality of the circumstances, the judge determined that there was a "pattern that seem[ed] to be increasing in seriousness and frequency," that Kenney was not "learning from his mistakes," and he was not honest. For those reasons, the ALJ recommended that Kenney's removal be sustained.

On March 29, 2018, after conducting an independent evaluation of the record, the CSC adopted the ALJ's findings of fact and conclusions and adopted her recommendation to sustain Kenney's removal.

Kenney filed a motion for reconsideration that the CSC denied on August 17, 2018, after concluding Kenney did not meet the standard for reconsideration. It found that Kenney failed to demonstrate there was a material error, that there was any new evidence, and his arguments were not credible. The CSC further found that "[t]he video of the incident confirm[ed] that [the resident] was backing away and was not acting in a threatening manner at the time of the

13

incident and there [was] no substantive information to show that [the resident] lunged at Kenney." It concluded that the charges against Kenney were supported by the record.

The CSC also denied reconsidering removal as the appropriate sanction. It noted that Kenney was "responsible for a vulnerable population of juvenile residents," and his act of pushing the resident and using hand and knee strikes, could not "be tolerated." This appeal followed.

Our review of a final agency decision is limited. In re Stallworth, 208 N.J. 182, 194 (2011). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious or unreasonable, or [ ] not supported by substantial credible evidence in the record as a whole.'" Ibid. (second alteration in original) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 580 (1980)). The burden of proving the agency's action is arbitrary, capricious, and unreasonable is on the challenger. Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011).

In making our determination we consider the following factors:

> (1)  [W]hether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly

erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[In re Carter, 191 N.J. 474, 482-83 (2007) (quoting Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995)).]

See also Bueno, 422 N.J. Super. at 233-34.

We "may not substitute [our] own judgment for the agency's even though [we] might have reached a different result." Carter, 191 N.J. at 483 (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). "Nevertheless, 'we are not bound by the agency's legal opinions.'" A.B. v. Div. of Med. Assistance & Health Servs., 407 N.J. Super. 330, 340 (App. Div. 2009) (quoting Levine v. State, Dep't of Transp., 338 N.J. Super. 28, 32 (App. Div. 2001)).

On appeal, Kenney argues that the CSC's decision not to reconsider Kenney's removal was a material error, and it improperly determined that the use of physical force against the resident was inappropriate. Kenney asserts that his use of force was justified as he was about to be assaulted, which was clear through the resident taking a few steps towards Kenney and raising his hands. He further argues that there was insufficient evidence to demonstrate he falsified the incident report. Instead, Kenney contends Cloud's failure "to accurately

detail the evidence" and Cloud's "hyper-technical" evaluation of his language was improper and not credible.

After carefully reviewing the record and applying our deferential standard of review, we affirm substantially for the reasons expressed by the ALJ in her thorough initial decision, as adopted by the CSC, and the CSC's decision not to reconsider that decision. We add only the following comments.

Where, as here, video tape evidence is involved, we will defer to an agency's determination as the fact finder, and not substitute our judgment for that of the agency, unless its "factual findings are so clearly mistaken—so wide of the mark—that the interests of justice demand intervention." State v. S.S., 229 N.J. 360, 381 (2017). Here, the ALJ and the CSC considered all evidence, including surveillance videos, and determined Kenney's version of what occurred was not credible. Specifically, she found that Kenney initiated unjustified physical force against the resident, used excessive force, and the resident never "lunged" towards Kenney. We therefore find no basis to reject the CSC's acceptance of the ALJ's factual findings and sustain Kenney's termination and the CSC's subsequent denial of Kenney's motion for reconsideration.

Finally, we have no cause to disturb the discipline imposed. Our "deferential standard applies to the review of disciplinary sanctions as well."

16

Stallworth, 208 N.J. at 195 (quoting In re Herrmann, 192 N.J. 19, 28 (2007)). In our review of "administrative sanctions, [we] . . . consider whether the 'punishment is so disproportionate to the offense, in the light of all of the circumstances, as to be shocking to one's sense of fairness.'" Ibid. (quoting Carter, 191 N.J. at 484).

Here, Kenney was responsible for the care of a vulnerable group of juvenile residents. His violation of that serious responsibility warranted his termination. Even if the incident on its own was insufficient, the incident coupled with Kenney's first disciplinary violation, as the ALJ determined, was more than sufficient to justify his termination. Id. at 196 (explaining that an employee's prior disciplinary history can be "considered in fashioning the 'appropriate penalty for the current specific offense'" (quoting West New York v. Bock, 38 N.J. 500, 523 (1962))).

"[P]rogressive discipline [may be] bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." Id. at 196-97 (emphasis added) (quoting Herrmann, 192 N.J. at 33). That risk of harm was clearly present here, and, combined with the vulnerable group of residents Kenney was responsible for, supported his termination. See Herrmann, 192 N.J.

17

at 38 (explaining that termination was appropriate, instead of progressive discipline, because "in so short a time," the employer could no longer trust the employee); Henry, 81 N.J. at 580 (reversing the CSC's decision to reduce penalty from removal to suspension where an employee falsified a report).

Since we have no cause to disagree with the CSC's adoption of the ALJ's recommendation sustaining removal, we need not consider Kenney's arguments relating to reconsideration of the CSC's final agency decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION