924 A.2d 525 (2007)
191 N.J. 474
In the Matter of John CARTER.
John Carter, Petitioner-Respondent,
v.
Township of Bordentown, Respondent-Appellant.
Supreme Court of New Jersey.
Argued January 17, 2007.
Decided June 20, 2007.
*526 Gregory J. Sullivan, Hamilton, argued the cause for appellant (Hartsough Kenny Chase & Sullivan, attorneys).
Mark W. Catanzaro, Moorestown, argued the cause for respondent (Mr. Catanzaro, attorney; Mr. Catanzaro and Ashley H. Auerbach, on the briefs).
Todd A. Wigder, Deputy Attorney General, submitted a letter in lieu of brief on behalf of respondent Merit System Board (Stuart Rabner, Attorney General of New Jersey, attorney).
Justice HOENS delivered the opinion of the Court.
Bordentown Police Officer John Carter was served with a series of disciplinary notices charging him with, among other things, sleeping on duty. Although the Merit System Board upheld the penalty of termination for that offense, the Appellate Division reversed, concluding that imposition of that sanction violated the principle of progressive discipline. We granted the Township of Bordentown's petition for certification, 188 N.J. 217, 902 A.2d 1234 (2006), and we now reverse and reinstate the penalty imposed by the Board.

*527 I.
Carter has been a police officer in Bordentown since 1991. Because of serious symptoms of an illness that first became manifest in 1998, he was out of work for a significant period of time in 1999. Early in 2000, Carter's illness was diagnosed, and he underwent treatment, following which he returned to his job in full active status. Thereafter, he continued to experience some symptoms related to his illness, but he did not request medical leave or other accommodations as a result.
Beginning in September 2000, the Bordentown Chief of Police issued a series of Preliminary Notices of Disciplinary Action that related to four separate incidents involving Carter. Each of those Notices advised Carter of the essential facts giving rise to the charges and identified the sections that he had violated as found in the New Jersey Administrative Code (N.J.A.C.), the Bordentown Township Police Department regulations (BTPD), and the Police Department's Standard Operating Procedures (SOP). Although only the sleeping on duty charge remains in issue, a brief summary of the events involved in the other charges is necessary to appreciate the context in which that charge arose.

A.
The September 26, 2000 Notice charged Carter with failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1), being absent without leave (AWOL), BTPD 3:2.3, neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), and unauthorized absence, BTPD 4:9.4(b), (c), and (e). These charges were all based on an incident in August 2000 when Carter failed to request a vacation week in a timely manner, was advised that his belated request could not be accommodated, and nevertheless went on vacation. He did so by providing his supervisor with a doctor's note suggesting that he needed medical treatment on the days he had requested for vacation after that request had been turned down. Carter then went to Disney World, during which time his supervisor discovered that the doctor's note related to dates prior to his earlier return to active status and thus was out-dated.
On March 2, 2001, Carter was served with two separate Notices, both of which related to incidents involving absences and the use of sick time. In particular, the first of the March Notices charged Carter with abuse of sick time and excessive absenteeism, N.J.A.C. 4A:2-2.3(a)(4), neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), unauthorized absence, BTPD 4:9.4(a), (c), (e), and violating SOP 98-070. The charges in that notice were based on Carter's use of ninety-seven sick days in a two-year period, as well as an incident, in December 2000. In the December incident, Carter called out sick but then went to a hockey game. As a result, he was not at his home, which was the applicable authorized place of confinement, when his supervisor arrived to verify his illness. The second of the March 2001 Notices charged Carter with abuse of sick time, N.J.A.C. 4A:2-2.3(a)(4), neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), unauthorized absence, BTPD 4:9.4(a), (c), (e), and violation of SOP 98-070. Those charges all related to an incident in January 2001 in which Carter called out sick to attend a sporting event. As with the December 2000 incident that gave rise to the other March 2001 Notice, Carter was not at home, his authorized place of confinement, when his supervisor attempted to find him.
The fourth Notice, dated November 7, 2001, is the focus of this appeal. In that Notice, Carter was charged with incompetency, inefficiency, and failure to perform duties, N.J.A.C. 4A:2-2.3(a)(1), conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), neglect of duty, N.J.A.C. 4A:2-2.3(a)(7), sleeping on duty, BTPD *528 3:2.1(a), failure to check in on radio, BTPD 2:6.11, and failure to adhere to general responsibilities of a police officer, BTPD 3:1.5(a)-(e). Each of the charges arose from a series of incidents discovered during a June 2001 investigation of allegations that Carter was sleeping on duty.
Information that Carter might be sleeping on duty first came to the attention of the Bordentown Township Chief of Police in July 2000. At that time, a citizen complained that he twice in one night called the police for assistance, each time thinking that he had awakened the dispatcher. The citizen complained that the police were not sent in response to the first call to the dispatcher and that they were not sent in a timely manner after his second call. The police chief retrieved the recording of the citizen's call and determined that Carter was the dispatcher on duty both times. After hearing the recording, the chief agreed that each time it sounded as if Carter had in fact been awakened by the telephone calls. The chief issued a written warning to Carter in August 2000, stating that sleeping on duty was not authorized and if Carter were to be found sleeping on duty, he would be served with major disciplinary charges. See N.J.A.C. 4A:2-2.2(a).
On June 7, 2001, Lieutenant Frank Nucera, who was the supervisor of the Internal Affairs Bureau, notified the police chief that other officers had alleged that Carter was sleeping on the job. The chief then authorized Nucera to investigate the allegations. Nucera secured the assistance of two police detectives and a sergeant to help with the investigation. On three successive dates in June, when Carter was working the midnight shift, these officers conducted the investigation into the sleeping on duty allegations.
During their investigation, the four officers saw Carter's patrol car parked on the side of Route 130 with its headlights off. The officers reported that they made several "drive-bys" at high rates of speed to which Carter did not react. They also documented that Carter failed to respond promptly to a call for assistance from another officer regarding a disturbance at a local restaurant. In addition, each night, the investigating officers, using night vision binoculars, observed Carter asleep in the front seat of his parked police car for various periods of time, including one in excess of two hours, and totaling more than five hours.
On September 5, 2001, two detectives interviewed Carter about the sleeping on duty allegations. When confronted, Carter conceded that he might have dozed off from time to time. He also told the detectives that he had been taking medication that could have caused him to do so. He denied, however, intentionally pulling off the road to sleep while on duty. Nucera concluded the internal investigation after that interview and informed the police chief of the findings.

B.
Following a departmental hearing relating to the sick time and place of confinement charges set forth in the two March 2001 Notices, Carter was served with two Final Notices of Disciplinary Action. The Final Notices imposed a fifteen-day suspension and a forty-five day suspension for those two charges. Carter elected to pursue an appeal of the charges and he then waived his right to a departmental hearing on the other charges. As a result, he was served with two additional Final Notices of Disciplinary Action. One addressed the charge in the September 2000 Notice, referred to as the AWOL charge, and imposed a fifteen-day suspension on Carter. The other Final Notice, relating to the sleeping on duty charges, terminated *529 Carter from his employment with the Bordentown Police Department. Carter appealed those disciplinary penalties as well, and all four were referred to the Office of Administrative Law for a hearing. See N.J.S.A. 52:14B-10(c).
Prior to the commencement of the hearing before the Administrative Law Judge (ALJ), Carter moved for dismissal of the sleeping on duty charges as untimely. See N.J.S.A. 40A:14-147. Following an initial decision by the ALJ and an interlocutory review, the Merit System Board concluded that some, but not all, of those charges were time-barred. The Board therefore sustained the dismissal of those charges that were based on violations of Bordentown's internal Police Department Rules and Regulations. At the same time, the Board concluded that the charges based on violations of Title 4A of the New Jersey Administrative Code were timely.
The ALJ conducted a hearing on all of the remaining disciplinary charges in April 2004. Relevant to the matters before us, the ALJ heard testimony from the Chief of Police, the investigating officers, and several other witnesses. Carter also testified and, although he conceded that he might have dozed off briefly on one or more occasions, he denied that he pulled his patrol car to the side of the road and slept in it for extended periods of time. He also explained that the previous police chief had an unwritten policy of permitting officers who were tired to come to the station house to sleep and that therefore sleeping on duty was not unauthorized. He testified that he could not recall receiving the police chief's August 2000 warning letter to him that specifically advised him that sleeping on duty would not be tolerated, but conceded that its language was clear and unambiguous.
In a written decision that thoroughly detailed each of the charges and all of the relevant testimony, the ALJ sustained all of the charges except abuse of sick time and excessive absenteeism in violation of N.J.A.C. 4A:2-2.3(a)4. The ALJ recommended that the fifteen-day suspension for the AWOL charge be reduced to ten days. He then concluded that the facts relating to the place of confinement allegations, which had resulted in separate fifteen-day and forty-five day suspensions, supported charges of neglect of duty, but should be cumulated and reduced to a single thirty-day suspension.
In considering the sleeping on duty charges, the ALJ concluded that the officers who testified about their investigation and their observations were credible and that Carter's denials about being asleep at the side of the road were not. The ALJ therefore found that Carter had in fact slept in his patrol car on June 8, 9, and 10, 2001, and that he had violated N.J.A.C. 4A:2-2.3(a)1, N.J.A.C. 4A:2-2.3(a)6, and N.J.A.C. 4A:2-2.3(a)7, as charged. The ALJ noted that Carter had "a history of multiple violations of rules and regulations." Based on all of the circumstances related to the sleeping on duty charge, and Carter's disciplinary history, which he considered to be of "some significance," the ALJ determined that "removal from service [was] the proper remedy."
In its August 14, 2004 opinion, the Merit System Board accepted and adopted the ALJ's findings and conclusions. The Board therefore affirmed the penalty of removal for the sleeping on duty charge and the modified penalties to be imposed for the other charges. In an unpublished opinion, the Appellate Division affirmed the Board's decision on the AWOL charge and the place of confinement violations, concluding that both the findings of fact and the modification of the penalties were "supported by credible evidence in the record and did not constitute arbitrary, capricious *530 or unreasonable action." In its analysis of the sleeping on duty charges, the Appellate Division agreed with the Board that there was a sufficient factual basis to sustain those charges, but, citing West New York v. Bock, 38 N.J. 500, 186 A.2d 97 (1962), concluded that "the punishment of removal for the `sleeping' charges was too severe and should be reevaluated" in accordance with the theory of progressive discipline.

C.
On appeal, Bordentown argues that the Appellate Division erred in failing to accord appropriate deference to the Board's expertise, in describing Carter's prior disciplinary record as "meager," and in concluding that termination was not an appropriate sanction for sleeping while on duty, thereby substituting its opinion for that of the Board and the appointing authority. Carter contends that the Appellate Division's analysis is correct and that, in accordance with the principles of progressive discipline, the imposition of the penalty of removal for the sleeping on duty infraction is both unwarranted and unfair.

II.
We need only briefly recite the relevant principles of law that guide our consideration of the issue before us. The scope of appellate review of a final agency decision is limited, see Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs, 186 N.J. 5, 15-16, 890 A.2d 922 (2006), and we do not ordinarily overturn such a decision "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence," Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562, 189 A.2d 712 (1963). As we have consistently stated, our role, in general, is limited to determining:
(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
[Mazza v. Bd. of Trustees, 143 N.J. 22, 25, 667 A.2d 1052 (1995) (citing Campbell, supra, 39 N.J. at 562, 189 A.2d 712).]
Moreover, in reviewing agency actions, "[a]ppellate courts must defer to an agency's expertise and superior knowledge of a particular field." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992). Although an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973), if substantial evidence supports the agency's decision, "a court may not substitute its own judgment for the agency's even though the court might have reached a different result," Greenwood, supra, 127 N.J. at 513, 606 A.2d 336.

III.
With these well-settled principles as our guide, we turn to the issue before us. Succinctly stated, the question we confront is whether the Appellate Division erred in concluding that the penalty of removal for Carter's sleeping while on duty infractions was excessive. In reaching this conclusion, the panel relied solely on its analysis of progressive discipline, reasoning that the Board erred both in relying on the multiple other disciplinary charges then being considered simultaneously for purposes *531 of evaluating Carter's disciplinary history, and in failing to abide strictly by the theory of progressive discipline.
The progressive discipline concept finds its origins in this Court's decision in Bock, supra, 38 N.J. at 523, 186 A.2d 97. There, by finding that a firefighter's prior disciplinary record was "inherently relevant" to determining an appropriate penalty for a subsequent offense, ibid., we rejected the argument that a proposed sanction must be based on the severity of the current infraction alone. We explained:
While a single instance may not be sufficient, numerous occurrences over a reasonably short space of time, even though sporadic, may evidence an attitude of indifference amounting to neglect of duty. Such conduct is particularly serious on the part of employees whose job is to protect the public safety and where the men serve precise shifts to afford continuous protection.
. . . .
[An employee's past record] cannot, of course, be utilized to prove a present charge which is not one of habitual misconduct. However, it may be resorted to for guidance in determining the appropriate penalty for the current specific offense.
[Id. at 522-23, 186 A.2d 97.]
This Court further noted that relevant past disciplinary events, which had occurred within a reasonable period of time prior to the offense being considered, "could include offenses [in which] minor discipline already had been imposed." Id. at 523, 186 A.2d 97.
In the years since we decided Bock, the theory of progressive discipline has most often been discussed in the context of labor disputes, in which employees' rights are often defined by contractual provisions relating to the imposition of discipline. See, e.g., County Coll. of Morris Staff Ass'n v. County Coll. of Morris, 100 N.J. 383, 392-93, 495 A.2d 865 (1985) (concluding that labor arbitrator lacked authority to reduce penalty by reading progressive discipline into contract); Local 462 v. Charles Schaefer & Sons, Inc., 223 N.J.Super. 520, 528, 539 A.2d 295 (App.Div.1988) (holding that labor arbitrator lacked authority to impose progressive discipline where contract was silent).
Even so, we have not regarded the theory of progressive discipline as a fixed and immutable rule to be followed without question. Instead, we have recognized that some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record. See Rawlings v. Police Dep't of Jersey City, 133 N.J. 182, 197-98, 627 A.2d 602 (1993) (upholding dismissal of police officer who refused drug screening as "fairly proportionate" to offense). In doing so, we have referred to analogous decisions to discern the test to be applied. See id. at 197, 627 A.2d 602. Thus, we have noted that the question for the courts is "whether such punishment is `so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" In re Polk License Revocation, 90 N.J. 550, 578, 449 A.2d 7 (1982) (considering punishment in license revocation proceeding) (quoting Pell v. Bd. of Educ., 34 N.Y.2d 222, 356 N.Y.S.2d 833, 313 N.E.2d 321, 327 (1974)).
Our Appellate Division, likewise, has both acknowledged and adhered to this principle, upholding dismissal where the acts charged, with or without any prior discipline, have warranted the imposition of that sanction. See, e.g., Klusaritz v. Cape May County, 387 N.J.Super. 305, 317, 903 A.2d 1095 (App.Div.2006) (affirming termination of county CPA with no prior disciplinary record who could not competently perform basic accounting *532 duties), certif. denied, 191 N.J. 318, 923 A.2d 232 (2007); Cosme v. Borough of East Newark, 304 N.J.Super. 191, 205-06, 698 A.2d 1287 (App.Div.1997) (finding termination appropriate for police officer who went on unauthorized paid vacation), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998); City of Newark v. Massey, 93 N.J.Super. 317, 322-25, 225 A.2d 723 (App.Div.1967) (concluding that police officer's multiple acts of insubordination and his careless handling of police weapon warranted termination).
In matters involving discipline of police and corrections officers, public safety concerns may also bear upon the propriety of the dismissal sanction. See, e.g., Henry v. Rahway State Prison, 81 N.J. 571, 580, 410 A.2d 686 (1980) (affirming appellate reversal of Board decision to reduce penalty from dismissal to suspension for prison guard who falsified report because of Board's failure to consider seriousness of charge); In re Hall, 335 N.J.Super. 45, 51, 760 A.2d 1148 (App.Div.2000) (reversing Board's decision to reduce penalty imposed on police officer for attempted theft from dismissal to suspension), certif. denied, 167 N.J. 629, 772 A.2d 931 (2001); Bowden v. Bayside State Prison, 268 N.J.Super. 301, 305-06, 633 A.2d 577 (App.Div.1993) (holding that it was arbitrary, capricious or unreasonable to reduce penalty from removal to six months' suspension where prison guard gambled with inmates for cigarettes), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994).
Indeed, as our Appellate Division has recognized:
a police officer is a special kind of public employee. His primary duty is to enforce and uphold the law. . . . He represents law and order to the citizenry and must present an image of personal integrity and dependability in order to have the respect of the public.
[Twp. of Moorestown v. Armstrong, 89 N.J.Super. 560, 566, 215 A.2d 775 (App. Div.1965), certif. denied, 47 N.J. 80, 219 A.2d 417 (1966).]
Moreover, as we have recently cautioned, courts should take care not to substitute their own views of whether a particular penalty is correct for those of the body charged with making that decision. See In re License Issued to Zahl, 186 N.J. 341, 353-54, 895 A.2d 437 (2006). Here, the appellate panel did precisely that, rejecting the well-reasoned analysis of the Board, considering the principle of progressive discipline to be an absolute mandate of law and regarding Carter's prior disciplinary history as insufficient.
In doing so, however, the panel misperceived the Board's analysis. Neither the ALJ nor the Board simply relied on Carter's prior history, including the numerous charges adjudicated along with the sleeping on duty charge, and applied the theory of progressive discipline to support the dismissal sanction. Instead, the ALJ also considered whether the offending behavior alone would support the penalty. The ALJ recognized that some offenses are sufficiently severe that dismissal is appropriate regardless of the extent of one's prior history of discipline. Noting that Carter did not have an unblemished prior record, the ALJ concluded that dismissal was appropriate for a police officer who pulls his patrol car to the side of the road to sleep on three successive nights, for periods as long as two hours at a time, who fails as a result to attend to his police duties, and who fails to promptly respond to another officer's call for assistance. Under these circumstances, we find nothing arbitrary or capricious about the imposition of the sanction of removal.
We do not suggest that removal is always the appropriate sanction to be imposed on a police officer who is found *533 sleeping while on duty. Circumstances relating to other officers or staffing patterns and practices in other municipalities might well dictate the imposition of a different penalty on another police officer. Nonetheless, in mandating that only a lesser penalty could be imposed, our appellate panel exceeded its proper role and inappropriately substituted its view for that of the appointing authority and the Board.

IV.
We therefore reverse the judgment of the Appellate Division and reinstate the penalty imposed by the Merit System Board.
For reversal and reinstatement  Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS  7.
Opposed  None.