SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**In the Matter of Brian Ambroise** (A-10-23) (088042)

**Argued January 29, 2024 -- Decided July 23, 2024**

**NORIEGA, J., writing for a unanimous Court.**

In this appeal, the Court reviews the Civil Service Commission's decision to impose a six-month suspension upon a correctional officer. The Commission did not accept the Department of Corrections' recommendation to remove the correctional officer from his position.

Respondent Senior Correctional Police Officer Brian Ambroise has been employed by petitioner the Department of Corrections (DOC) since 2013. Ambroise spent his entire career at the Edna Mahan Correctional Facility for Women (EMCF), and his employment record was apparently unblemished before the instant matter.

In December 2020, the DOC issued final disciplinary charges against Ambroise seeking his removal for conduct unbecoming a public employee and other sufficient cause. Additionally, the DOC charged Ambroise with violations of two DOC policies: conduct unbecoming a public employee and undue familiarity with inmates, parolees, their families, or friends. The policies permitted disciplinary sanctions up to and including removal.

The facts underlying those charges stem from information received by the EMCF's Special Investigation Division in 2016 from J.O., an inmate who reported that she was having a sexual relationship with Ambroise. J.O. additionally alleged that she and Ambroise had a close personal relationship and that he would perform favors for her, such as bringing in contraband and passing a written message between her and another inmate at her request. Ambroise admitted -- and never retracted -- that he kissed J.O. and that he failed to report the kiss, despite knowing DOC's mandatory reporting policy of unusual incidents. At a hearing on the charges before an Administrative Law Judge (ALJ), Ambroise additionally confirmed that J.O. requested that he bring contraband into the prison, that he did not report the request, and that not reporting J.O.'s request violated the DOC's mandatory reporting policy for unusual incidents. Moreover, Ambroise conceded that he delivered a personal message from J.O. to another inmate.

1

The ALJ modified the DOC's penalty from removal to a twenty-day suspension, sustained one charge -- Ambroise's failure to report that J.O. kissed him -- and dismissed the others.

The DOC appealed the ALJ's decision to the Commission. The Commission affirmed the finding that Ambroise violated the DOC's reporting policy by not reporting J.O.'s kiss. It reversed the ALJ's dismissal of the undue familiarity charge, finding that Ambroise's admission to passing a message between J.O. and another inmate "establishe[d] that he was unduly familiar." The Commission remarked that regardless of the message's content or context, Ambroise's simple act of facilitating the transfer was highly inappropriate and that at least two inmates knew Ambroise was willing to violate DOC policy on their behalf. The Commission accordingly determined that this act could have affected the safety and security of the facility. In fashioning the appropriate penalty for Ambroise, the Commission utilized the concept of progressive discipline and ordered Ambroise's suspension to be modified to six months with back pay, benefits, and seniority.

The DOC appealed the Commission's final administrative determination to the Appellate Division. The Appellate Division affirmed the judgment. It concluded that the Commission "considered the nature and circumstances of the charges" against Ambroise and reasonably determined that removal was not warranted in light of his previously unblemished employment record.

The Court granted certification. 255 N.J. 411 (2023).

**HELD:** The Commission acted arbitrarily, capriciously, and unreasonably for failing to credit the Department of Corrections' view that the sustained charges against the officer undermined prison security and touched directly at the heart of his ability to obey the protocols pertaining to his employment at a correctional facility. The Commission's decision to impose a six-month sanction is disproportionate to the serious and highly concerning offenses found in this record.

1. Henry v. Rahway State Prison involved an appeal of a disciplinary action against a DOC employee alleged to have deliberately falsified and omitted information from a report. 81 N.J. 571, 573-74 (1980). Henry's report stated that he found marijuana in the weight room and did not know to whom it belonged. Id. at 574. In fact, Henry found the marijuana on an inmate's bed in the prison's dormitory. Ibid. The DOC ordered Henry's removal. Ibid. The Commission, however, reduced Henry's penalty to a ninety-day suspension after finding that Henry "was conducting his own investigation of a scheme to sell marijuana" and that he "had no improper motives and was guilty only of exercising poor judgment." Ibid. Upon review, the Court found the Commission's penalty reduction to be arbitrary, capricious, and unreasonable, concluding that the Commission failed to consider the seriousness of

2

Henry's offenses given that he had no authorization to conduct an independent investigation and that his simple act of falsifying "a report can disrupt and destroy order and discipline in a prison." Id. at 580. After Henry, the Appellate Division recognized the "sui generis" characteristics of correctional facilities, noting that if they do not function properly, they "have a capacity to become 'tinderboxes'"; it accordingly reversed the reduction of the penalty imposed by the DOC. Bowden v. Bayside State Prison, 268 N.J. Super. 301, 305-06 (App. Div. 1993). (pp. 19-21)

2. In determining sanctions, the Commission can utilize progressive discipline, a concept the Court first endorsed in Town of West New York v. Bock, 38 N.J. 500, 523 (1962). Since Bock, the concept of progressive discipline has been utilized in two ways when determining the appropriate penalty for present misconduct: (1) to support the imposition of a more severe penalty for a public employee who engages in habitual misconduct, or (2) to mitigate the penalty for a current offense. But progressive discipline is not a fixed and immutable rule to be followed without question because some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record. Dismissal of an officer is especially warranted for those infractions that go to the heart of the officer's ability to be trusted to function appropriately in his position. (pp. 22-24)

3. Here, the Court concludes that the reduction of Ambroise's penalty was arbitrary, capricious, and unreasonable. Intimate contact between an inmate and a corrections officer whether initiated by the inmate or the officer can never be anything but unusual. In this regard, Ambroise had no choice but to report that incident. As the DOC explains, the effect of Ambroise's withholding of this information directly implicates his ability to be trusted as a correctional officer, and it adversely affects prison security, discipline, and order. Additionally, Ambroise conceded he passed a personal message to another inmate at J.O.'s request. That act impacted prison security because at least two inmates now knew that Ambroise, in his position as an officer, was willing to break the rules for their benefit. The DOC concluded that Ambroise can no longer be trusted to work in a prison facility in light of these two offenses. The DOC's assessment should have been afforded significant weight because the gravity of Ambroise's conduct cannot be understated. The Commission's decision to impose a six-month sanction is disproportionate to the serious and highly concerning offenses found in this record, and therefore, it is arbitrary, capricious, and unreasonable. (pp. 25-31)

     **REVERSED and REMANDED.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE NORIEGA's opinion.**

In the Matter of
Brian Ambroise.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 29, 2024 | July 23, 2024 |

Nathaniel Levy, Deputy Attorney General, argued the cause for appellant New Jersey Department of Corrections (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, Donna Arons and Melissa Dutton Schaffer, Assistant Attorneys General, of counsel, and Nathaniel Levy and Ryan J. Silver, Deputy Attorney General, on the briefs).

Jay McCann argued the cause for respondent Brian Ambroise (Wronko & Loewen, attorneys; James R. Wronko, on the brief).

Timothy P. Malone argued the cause for respondent New Jersey Civil Service Commission (Pashman Stein Walder Hayden, attorneys; Timothy P. Malone, on the briefs).

Elyla Huertas argued the cause for amici curiae Max Compound Advisory Group at Edna Mahan Correctional Facility, Incarcerated Persons Liaison Committee for Edna Mahan Correctional Facility, and Edna Mahan Board of Trustees (American Civil Liberties Union of New Jersey Foundation, attorneys; Elyla Huertas, Alexander Shalom, and Jeanne LoCicero, on the brief).

We are called upon to review the Civil Service Commission's (Commission) decision to impose a six-month suspension upon a correctional officer. The officer admitted to an instance of undue familiarity and failing to report an unusual incident in violation of certain Department of Corrections policies. The Commission did not accept the Department of Corrections' recommendation to remove the correctional officer from his position.

We reverse the judgment of the Appellate Division and hold that the Commission acted arbitrarily, capriciously, and unreasonably for failing to credit the Department of Corrections' view that the sustained charges against the officer undermined prison security and touched directly at the heart of his ability to obey the protocols pertaining to his employment at a correctional facility.

I.

A.

Respondent Senior Correctional Police Officer Brian Ambroise has been employed by petitioner the Department of Corrections (DOC) since 2013. Ambroise spent his entire career at the Edna Mahan Correctional Facility for

Women (EMCF) in Clinton Township. Ambroise's employment record was apparently unblemished before the instant matter arose.[1]

On December 4, 2020, the DOC issued final disciplinary charges against Ambroise seeking his removal for conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6), and other sufficient cause, id. at (a)(12). Additionally, the DOC charged Ambroise with violations of two DOC policies: conduct unbecoming a public employee, Human Resources Bulletin (HRB) 84-17C(11), and undue familiarity with inmates, parolees, their families, or friends, HRB 84-17 D(4). The policies permitted disciplinary sanctions up to and including removal for any employees found to have violated them.

The facts underlying those charges stem from information received by the EMCF's Special Investigation Division (SID) on October 3, 2016, from J.O.,[2] an inmate who reported that she was having a sexual relationship with Ambroise. J.O. alleged Ambroise kissed her and performed oral sex on her in

---

[1]  The record before this Court reveals that Ambroise had "one suspension for failing to restrain or maintain observation of an inmate," though the parties never disputed the "unblemished" characterization of Ambroise's record. Because none of the parties have raised this point, and it is unsupported by additional reference throughout the record, we note it but do not rely upon it in reaching our conclusion.

[2]  To safeguard J.O.'s anonymity, we use her initials pursuant to Rule 1:38-3(c)(12).

a storage closet, and she provided SID with Q-tips that she used to swab her mouth and vaginal area following the incident.

On October 6, 2016, SID referred the matter to the Hunterdon County Prosecutor's Office (HCPO) for a criminal investigation. SID Principal Investigator Jerome Scott and HCPO Lieutenant Kristen Larsen conducted a video-recorded interview with J.O. She alleged that on September 25, 2016, Ambroise told her to meet him in a supply closet to have sex. She said she went into the closet wearing a nightgown and no undergarments. She claimed that she and Ambroise kissed, and that he performed oral sex on her for three to four minutes before he became uncomfortable and left the closet. J.O. reported that she then returned to her bed and wiped her mouth and vaginal area with Q-tips. J.O. additionally alleged that she and Ambroise had a close personal relationship and that he would perform favors for her, such as bringing in contraband and passing a written message between her and another inmate at her request. Following the interview, J.O. consented to a buccal swab to collect her DNA for comparison.

That same day, Larsen and Scott, as well as HCPO Detective Sergeant Aaron Lacey and SID Senior Investigator Michael Kubik, met with Ambroise to conduct a video-recorded interview. The investigators began the interview

4

by reading Ambroise his Miranda[3] rights and informing him that a criminal investigation was being conducted. Ambroise acknowledged that he understood and waived his Miranda rights, and Lacey informed him that the interview could be terminated at any time. Ambroise also requested a union representative to be present, which the investigators denied because the matter pertained to a criminal investigation. Scott, however, told Ambroise that the statements made could impact his employment.

The formal interview lasted 110 minutes, during which time Ambroise gave varying accounts of the alleged sexual encounter in the supply closet with J.O. Relevant here, Ambroise admitted -- and never retracted -- that he kissed J.O. and that he failed to report the kiss, despite knowing DOC's mandatory reporting policy of unusual incidents. At the conclusion of his statement, he expressed to investigators that he did not feel coerced and that he was treated fairly. Ambroise was then arrested and charged with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(2), and second-degree official misconduct, N.J.S.A. 2C:30-2(a).

The next day, on October 7, 2016, SID served Ambroise with a preliminary notice of disciplinary action seeking his removal for conduct

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

unbecoming a public employee, for other sufficient cause, and for violations of other DOC policies.

B.

1.

Ambroise's criminal trial took place in 2017. Prior to trial, the court entered an order wherein Ambroise stipulated that the statements he made in the October 6, 2016, video interview were given knowingly and voluntarily. Ambroise did not object to the video being entered into evidence. At the conclusion of the trial in 2018, a jury acquitted Ambroise on all charges.

SID thereafter forwarded the matter to the DOC for administrative action. A hearing was held in November 2020, and a final disciplinary action sustaining all the charges against Ambroise and proposing his removal was issued in December of that year. Ambroise appealed the DOC's decision, and the matter was transmitted to the Office of Administrative Law (OAL) for a hearing as a contested case.

The hearing was conducted before an Administrative Law Judge (ALJ) on June 23 and 24, 2021. Correctional Police Administrative Lieutenant Altarique Washington testified at the hearing regarding the DOC's policies and procedures. He testified that the DOC has a zero-tolerance policy toward all forms of inmate abuse and that violating this policy is grounds for removal.

6

He additionally testified that the DOC has a zero-tolerance policy for undue familiarity with inmates, which encompasses anything more than a supervisory role, and that officers must report all unusual incidents, having no discretion to withhold information. Washington stated that the failure to report an unusual incident is a removable offense.

The ALJ also heard the testimony of Katherine Meakim, a forensic scientist for the New Jersey State Police. Meakim testified as a fact witness regarding DNA reports she made from the swabs produced by J.O. and SID. Meakim testified that the swabs from J.O.'s vaginal area contained DNA matching both J.O. and Ambroise but admitted that the match to Ambroise was not unique because the DNA result would have matched one in 3,190 men. Meakim additionally could not provide testimony pertaining to the DNA swabs' chain of custody and conceded that Ambroise's DNA could have been lifted from a water bottle or cup.

SID Investigator Scott also testified at the hearing. He detailed the process of J.O. informing him of the incident and explained that she provided him with the Q-tips. He corroborated Washington's testimony regarding undue familiarity policies generally. Scott also acknowledged that Ambroise's request for a union representative was denied but later admitted that one

should have been present because the investigation was both criminal and administrative in nature.

Finally, Ambroise testified. He maintained that he never had a sexual relationship with J.O. and claimed to have told the truth during his interview with the investigators. He testified that after an hour and a half of questioning, he felt pressured to tell the investigators what they wanted to hear. He claimed that his confession was coerced because he was promised a lighter sentence and a chance to see his children again.

Ambroise then provided another version of what occurred in the supply closet. He stated that he was in the closet, kneeling to retrieve supplies when J.O. entered, causing him to pivot and stand up. After he stood, her face met his face, and she gave him a quick kiss. Ambroise admitted to knowing he was required to report the incident. He stated he did not report it because he did not think the incident rose to the level of unusual that warranted reporting. He stated that he ordered J.O. to go back to her cell and felt he handled the situation with a verbal reprimand.

Ambroise additionally confirmed that J.O. requested that he bring contraband into the prison. He stated that he found that request concerning but did not report it because he denied the request and such requests were common. Ambroise then acknowledged that not reporting J.O.'s request

8

violated the DOC's mandatory reporting policy for unusual incidents. Moreover, Ambroise conceded that he delivered a personal message from J.O. to another inmate. He explained that he felt it did not demonstrate favoritism nor did it affect prison security because the content of the message was harmless. J.O. did not testify.

On July 26, 2021, the ALJ issued a written decision modifying the DOC's penalty from removal to a twenty-day suspension. The ALJ sustained one charge -- Ambroise's failure to report that J.O. kissed him -- and dismissed the others. With respect to the testimony presented, the ALJ found J.O.'s recorded interview not credible, assigning it no weight. The judge explained that the statements made in the recorded interview remained uncorroborated because J.O. did not testify in person, and the State did not offer her testimony from the criminal trial.

Because of the interrogation tactics used, the ALJ found that Ambroise's recorded confession was coerced and involuntary, assigning it no weight. The ALJ, however, determined that Ambroise's in-person testimony was credible and consistent with the statements made in his video interview before investigators employed inappropriate techniques. The ALJ also found the other DOC witnesses credible but gave their accounts little weight because they had no first-hand knowledge of Ambroise's conduct. Finally, Meakim's

9

testimony received little to no weight because, according to the ALJ, there was "no source of the collection identified, or any testimony about chain of custody."

As to the charges, the ALJ concluded that Ambroise did not have an intimate or sexual relationship with J.O. because that charge was based entirely on J.O.'s and Amboise's recorded interviews and the DNA results, which she discredited. Regarding the encounter in the supply closet, the ALJ found that J.O. came up behind Ambroise, gave him a quick kiss, and that he terminated the contact.

The ALJ sustained the failure to report charge, concluding that the kiss should have been reported "out of an abundance of caution," but explained that the record before her did not clarify what is considered an unusual incident that needed to be reported. She reasoned that an unusual incident must rise to the level of something that could jeopardize the safety or security of a prison and must therefore be more than just a quick, unexpected kiss.

With respect to the undue familiarity charge, the ALJ noted that Ambroise admitted to passing a message from J.O. to another inmate but declined to find that conduct constituted undue familiarity. She explained that the content of the message did not jeopardize the safety or security of the facility and that the act of passing the message did not imply or demonstrate

10

undue familiarity. Lastly, the ALJ found no evidence that Ambroise brought contraband into the prison.

2.

The DOC appealed the ALJ's decision to the Commission. It also filed a motion asking the Commission to remand and reopen the OAL hearing pursuant to N.J.A.C. 1:1-18.5(b) based on what it contended was newly discovered evidence that, in Ambroise's 2017 criminal trial, he stipulated that his recorded confession was given freely, knowingly, and voluntarily.

The Commission denied the motion to reopen because the criminal stipulation was "not persuasive in demonstrating that the ALJ's credibility determinations regarding [Ambroise's] testimony about the confession" were erroneous.

The Commission reviewed the charges de novo. It adopted the ALJ's credibility and weight determinations regarding the recorded interviews and testimony, as well as the ALJ's findings that the DOC did not establish that a sexual or intimate relationship between J.O. and Ambroise occurred. The Commission affirmed the finding that Ambroise violated the DOC's reporting policy by not reporting J.O.'s kiss. It disagreed, however, with the ALJ's conclusion that the kiss was not so unusual as to warrant reporting, noting that it "cannot fathom how any custodial staff in a correctional facility for women

11

could reasonably interpret an unwanted kiss as anything but an unusual incident that needed to be reported."

The Commission reversed the ALJ's dismissal of the undue familiarity charge. It agreed with the ALJ that there "was no competent evidence regarding the contraband allegations" but found that Ambroise's own admission to passing a message between J.O. and another inmate "establishe[d] that he was unduly familiar." The Commission remarked that regardless of the message's content or context, Ambroise's simple act of facilitating the transfer was highly inappropriate and that at least two inmates knew Ambroise was willing to violate DOC policy on their behalf. The Commission accordingly determined that this act could have affected the safety and security of the facility.

In fashioning the appropriate penalty for Ambroise, the Commission utilized the concept of progressive discipline while recognizing that a single egregious act could provide the basis for an employee's removal notwithstanding that employee's untarnished disciplinary history. The Commission found Ambroise's combined infractions of failing to report and undue familiarity "clearly serious and highly concerning," because they "put[] into question [his] judgment to effectively perform the duties required of the

12

position," and "touch at the heart of the safety and security of correctional facilities."

In sustaining the charges for failing to report and undue familiarity, the Commission nevertheless determined that a six-month suspension was the proper penalty. It reasoned that "given the way this entire matter proceeded and acknowledging that the most serious misconduct was not proven, the Commission cannot find that [Ambroise] should be removed without a second opportunity to demonstrate his competence." In its final administrative determination, the Commission ordered Ambroise's suspension to be modified to six months with back pay, benefits, and seniority pursuant to N.J.A.C. 4A:2-2.10.

3.

The DOC appealed the Commission's final administrative determination to the Appellate Division. The Appellate Division affirmed the judgment. It concluded that the Commission "considered the nature and circumstances of the charges" against Ambroise and reasonably determined that removal was not warranted in light of his previously unblemished employment record. The appellate court rejected the DOC's argument that the Commission erred in adopting the ALJ's conclusion regarding the lack of evidence to support the sexual contact charges. The court determined that the ALJ misapplied the

13

criminal law in her assessment of Ambroise's statement, explaining that the investigators did not coerce a confession, but found that the error did not undermine her credibility determinations. As such, the court found that the ALJ acted reasonably as a factfinder in assigning Ambroise's confession no weight, affirming the Commission's de novo review of the record to reach the same conclusion.

The Appellate Division additionally rejected the DOC's arguments to reopen the hearings. The court explained that the stipulated order was not newly discovered evidence because it was a record readily available in the criminal docket since 2017. The appellate court clarified that the stipulation addressed only the voluntariness of Ambroise's confession, whereas determining the credibility and weight of the statements remained in the ALJ's purview as the factfinder. The Appellate Division accordingly affirmed Ambroise's six-month suspension.

4.

We granted the DOC's petition for certification. 255 N.J. 411 (2023). We also granted the joint application of the Max Compound Advisory Group at Edna Mahan Correctional Facility, the Incarcerated Persons Liaison Committee for Edna Mahan Correctional Facility, and the Edna Mahan Board of Trustees to participate as amici curiae.

14

II.

A.

The DOC asks us to reverse the Appellate Division's judgment and argues that the Appellate Division erred by (1) failing to give weight to the DOC's unique expertise in maintaining the safety of correctional facilities and (2) declining to remand and reopen the matter for a further hearing. Specifically, the DOC relies on Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980), and Bowden v. Bayside State Prison, 268 N.J. Super. 301, 305-06 (App. Div. 1993), for the proposition that failing to credit the DOC's expertise in maintaining prison security upon de novo review violates administrative law principles in these unique circumstances. The DOC further argues that N.J.S.A. 30:1B-6(g) gives it broad discretionary power to fashion disciplinary policies and that, under this authority, it has established a zero-tolerance policy for undue familiarity between correctional officers and inmates because such relationships fundamentally threaten prison security.

The DOC additionally contends that the matter should be reopened based on Ambroise's stipulation because, in its view, the ALJ did not make credibility determinations that were distinct from her conclusions as to the voluntariness and appropriateness of Ambroise's recorded confession.

15

Amici curiae ask this Court to reverse the judgment of the Appellate Division, advancing various policy-based arguments in favor of maintaining the safety of Edna Mahan inmates considering the facility's controversial history.

B.

The Commission asserts that this Court should affirm the Appellate Division's judgment because the court appropriately deferred to the Commission's decision-making authority. The Commission contends that it afforded the DOC's recommended sanction significant weight but disagreed with it. The Commission asserts that it fully addressed the record and relevant issues, including Ambroise's clean disciplinary history, to conclude that removing Ambroise was not warranted but that a twenty-day suspension for his highly concerning conduct was insufficient. Additionally, the Commission argues that reopening the matter is unnecessary because, even if Ambroise's confession was voluntarily given, the ALJ acted appropriately as a factfinder to determine that his confession was not credible.

Ambroise requests that this Court affirm the judgment of the Appellate Division, stressing that the limited standard of review for agency decisions -- including those involving disciplinary actions -- mandates that this Court defer to the Commission's final decision. Ambroise explains that, here, "the

16

[Commission] considered all the pertinent factors and applicable law and concluded that a six month suspension and not removal was warranted." He also argues that the Commission's penalty does not shock the conscience. He additionally relies on Henry, 81 N.J. at 578-79, in which this Court declined to endorse a heightened standard of review for law enforcement disciplinary decisions beyond the Commission's de novo standard of review. Finally, Ambroise contends that the OAL hearing does not need to be reopened because the stipulation order was publicly available and spoke only to the issue of voluntariness, not whether the confession was credible.

III.

A.

The standard of review for agency decisions is well-settled. "Appellate courts have 'a limited role' in the review of [Commission] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry, 81 N.J. at 579); see also In re Carter, 191 N.J. 474, 482 (2007). "In order to reverse an agency's judgment, an appellate court must find the agency's decision to be 'arbitrary, capricious, or unreasonable or . . . not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80). If a court finds that the Commission's decision was arbitrary, "the court may either finally determine the matter by fixing the

17

appropriate penalty or remand to the Commission for redetermination." Ibid. (quoting Henry, 81 N.J. at 580); see also Town of West New York v. Bock, 38 N.J. 500, 520 (1962) ("We also have no doubt of our authority to disagree with the intermediate tribunal and fix the punishment ourselves in order to finally and completely determine the cause on review where that course is indicated.").

To assess whether an agency decision is arbitrary, capricious, or unreasonable, a court must examine:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Carter, 191 N.J. at 482 (quoting Mazza v. Bd. of Trs., PFRS, 143 N.J. 22, 25 (1995)).]

This "deferential standard applies to the review of disciplinary sanctions as well." In re Herrmann, 192 N.J. 19, 28 (2007). We may not substitute our own judgment for that of the agency's even though we may have reached a different result. Stallworth, 208 N.J. at 194; see also In re Revocation of the License of Polk, 90 N.J. 550, 578 (1982) ("The Court has no power to act independently as an administrative tribunal or to substitute its judgment for

18

that of the agency"). We must therefore "consider whether the 'punishment is so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness.'" Stallworth, 208 N.J. at 195 (quoting Carter, 191 N.J. at 484).

B.

In Henry, we addressed how the Commission may review DOC's disciplinary determinations, rejecting the premise of a heightened standard of review for discipline of law enforcement employees. 81 N.J. at 579-80. We noted that the Commission "may receive testimony and other evidence pertaining to safety, security, and discipline in the prisons" and "may consider evidence concerning the importance of the position and the employee in maintaining safety and discipline." Id. at 579. We also recognized that other relevant considerations may include evidence establishing the breach of duty's "effect on the institution, the inmates, and other corrections officers." Ibid.

Henry involved an appeal of a disciplinary action against Otis Henry, a DOC employee, as well as a second employee whose case is not relevant here. Id. at 573.

Henry's disciplinary matter arose from charges that alleged he deliberately falsified and omitted information from a report after he found contraband in Rahway State Prison. Id. at 574. Henry's report stated that he

19

found marijuana in the weight room and did not know to whom it belonged. Ibid. In fact, Henry found the marijuana on an inmate's bed in the prison's dormitory. Ibid. The DOC accordingly ordered Henry's removal after finding that he was guilty of neglect of duty and conduct unbecoming of a public employee. Ibid. The Commission, however, reduced Henry's penalty to a ninety-day suspension after finding that Henry "was conducting his own investigation of a scheme to sell marijuana" and that he "had no improper motives and was guilty only of exercising poor judgment." Ibid.

Upon review, we found the Commission's penalty reduction to be arbitrary, capricious, and unreasonable. Id. at 580. Careful to not disturb the factual findings, we concluded that the Commission failed to consider the seriousness of Henry's offenses. Ibid. We explained that although Henry may not have had ill intent, he had no discretion or authorization to conduct an independent investigation; his duty was solely "to confiscate the marijuana and submit a truthful report." Ibid. Additionally, we recognized that Henry's simple act of falsifying "a report can disrupt and destroy order and discipline in a prison." Ibid. We thus remanded to the Commission to redetermine an appropriate penalty for Henry. Ibid.

After Henry, the Appellate Division recognized the "sui generis" characteristics of correctional facilities, noting that if they do not function

20

properly, they "have a capacity to become 'tinderboxes.'" Bowden, 268 N.J. Super. at 305-06. In Bowden, the DOC ordered the removal of a correctional officer for undue familiarity after the officer played cards with inmates, subsequently causing the officer to bring large quantities of cigarettes into the facility to pay off his gambling debts. Id. at 303. The ALJ disagreed with the DOC's penalty of removal and modified his penalty to a six-month suspension, even though the officer had faced minor suspensions in the past. Ibid. The predecessor to the Commission, the Merit System Board, affirmed the ALJ's decision. Ibid.

The Appellate Division reversed and reinstated the officer's removal, explaining "that it is the appraisal of the seriousness of the offense which lies at the heart of the matter." Id. at 305 (emphasis added). The appellate court did not disturb the Merit System Board's factual findings but found that like in Henry, the Board "did not adequately consider the seriousness of the charges." Id. at 306. The court further explained that the seriousness of the offense "and degree to which such offenses subvert discipline at Bayside State Prison are matters peculiarly within the expertise of the corrections officials," whose appraisals therefore "should be given significant weight." Ibid.

21

C.

The Commission is empowered to review de novo the disciplinary charges before it, N.J.S.A. 11A:2-6, and may "disapprove the penalty imposed by the appointing authority." Henry, 81 N.J. at 575. In determining sanctions, it can utilize progressive discipline, a concept this Court first endorsed in Bock, 38 N.J. at 523.

Bock involved a fireman who was found guilty of habitual tardiness and neglect of duty and was therefore relieved from his position. Id. at 503-06. The Commission reduced Bock's sanction, and the Appellate Division reduced it further. Id. at 508-12. We affirmed the Appellate Division's judgment, noting that "habitual tardiness" or "chronic misconduct" can be grounds for dismissal. Id. at 522. We explained that "[w]hile a single instance [of misconduct] may not be sufficient" for termination, "numerous occurrences over a reasonably short space of time, even though sporadic, may evidence" a "neglect of duty." Ibid. We noted that an employee's record, such as a history of promotions, formal adjudications, and other instances of misconduct, could be considered when fashioning penalties for an offense. Id. at 523. Although we did not accept the Appellate Division's analysis, we concluded that the town had not demonstrated the reduced penalty imposed by that court "to be insufficient upon a consideration of the permissible elements." Id. at 528.

22

"Since Bock, the concept of progressive discipline has been utilized in two ways when determining the appropriate penalty for present misconduct": (1) to "support the imposition of a more severe penalty for a public employee who engages in habitual misconduct," in other words, "to ratchet-up a penalty for a present offense," or (2) to "mitigate the penalty for a current offense." Herrmann, 192 N.J. at 30-33. We continue to recognize that a "dismal disciplinary record can support an appointing authority's decision to rid itself of a problematic employee based on charges that, but for the past record, ordinarily would have resulted in a lesser sanction." Id. at 32.

"On the other hand, progressive discipline is not 'a fixed and immutable rule to be followed without question' because 'some disciplinary infractions are so serious that removal is appropriate notwithstanding a largely unblemished prior record.'" Stallworth, 208 N.J. at 196 (quoting Carter, 191 N.J. at 484). We adhere to the principle that progressive discipline may be "bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes a risk of harm to persons or property." Herrmann, 192 N.J. at 33 (emphasis added). Indeed, "progressive discipline is not a necessary consideration . . . when the misconduct is severe, when it is unbecoming to the employee's position or renders the employee unsuitable for the continuation in the

23

position, or when application of the principle would be contrary to the public interest." Ibid.

Correctional officers, like police, serve a vital role in "enforc[ing] and uphold[ing] the law" and in "represent[ing] law and order to the citizenry." Township of Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965); see also N.J.S.A. 2A:154-4 (authorizing correctional officers to exercise full police power). Thus, for police and correctional officers alike, "[a]cts that subvert good order and discipline" can "constitute conduct so unbecoming . . . as to warrant dismissal." Herrmann, 192 N.J. at 35 (quoting Cosme v. E. Newark Twp. Comm., 304 N.J. Super. 191, 205-06 (App. Div. 1997)).

Dismissal of an officer is especially warranted for those "infractions that [go] to the heart of the officer's ability to be trusted to function appropriately in his position." Ibid. (emphasis added); see, e.g., Henry, 81 N.J. at 571 (finding progressive discipline unnecessary when a correctional officer's false report adversely affected prison security); Bowden, 268 N.J. Super. at 306 (dismissing a correctional officer for undermining prison order by playing cards with inmates); Carter, 191 N.J. at 486 (dismissing a police officer for sleeping in his patrol car on three separate nights while on duty, thus not promptly responding to another officer's call for assistance); In re Hall, 335

24

N.J. Super. 45, 51 (App. Div. 2000) (dismissing a police officer who committed an attempted theft while part of his uniform was displayed).

IV.

With those principles in mind, we must consider whether the Commission acted arbitrarily, capriciously, or unreasonably when it modified Ambroise's sanction to a six-month suspension. We conduct this inquiry considering the unique facts presented in this circumstance without disturbing the Commission's findings of fact. As such, we address only the two sustained charges: (1) Ambroise's failure to report J.O.'s kiss as an unusual incident and (2) Ambroise's undue familiarity with J.O. for passing a personal message between her and another inmate.

Although the Commission stated that those acts were highly inappropriate and concerning, it failed to give adequate weight to the DOC's appraisal of the "seriousness of [the officer's] offense[s]," Bowden, 268 N.J. Super. at 305. In doing so, the Commission deviated from the DOC's recommended sanction of removal without citing mitigating factors supported by credible evidence in the record, Herrmann, 192 N.J. at 31, 33, to demonstrate Ambroise's ability to return to his position.

25

We hold that the Commission's imposition a six-month suspension on these facts is shocking to "one's sense of fairness," Stallworth, 208 N.J. at 194, and was therefore arbitrary, capricious, and unreasonable.

The DOC holds its law enforcement officers to a higher standard of conduct than other public officials and mandates that those officers strictly exercise their duty to maintain the public trust. N.J.S.A. 2A:154-4; Armstrong, 89 N.J. Super. at 566. That duty extends to correctional officers who are tasked with maintaining order and discipline inside of correctional institutions. In re Disciplinary Procs. Of Phillips, 117 N.J. 567, 576-77 (1990). Correctional officers, like police officers, must "represent[] law and order to the citizenry and . . . present an image of personal integrity and dependability in order to have the respect of the public." Armstrong, 89 N.J. Super. at 566.

The Legislature has afforded the DOC Commissioner with "broad discretionary power" in all administrative matters of a prison facility pursuant to N.J.S.A. 30:1B-6(g). Russo v. Dep't of Corr., 342 N.J. Super. 576, 583 (App. Div. 1999). The DOC, acting under that authority, implemented its own Rules and Regulations for Law Enforcement Personnel. Specifically, Article II, Section 6 requires all officers to submit a written report for "unusual incidents which come to the officer[s'] attention during the performance of

26

duty" and precludes officers from "<u>withholding any information on such matters for any reason</u>." (emphasis added). Article III, Section 4 provides that "[n]o officer shall become unduly familiar with inmates who are incarcerated" and Article IX, Section 1 prohibits personal relationships "that will interfere with [an officer's] proper performance of duty." Finally, Article IX, Section 6 forbids officers from using their positions "to secure unwarranted privileges or advantages, either for themselves or <u>for others</u>." (emphasis added)

Throughout these proceedings, Ambroise maintained that a kiss between him and J.O. occurred. He additionally admitted that he did not report that kiss because he did not feel it was "unusual enough," even though he was aware of the DOC's mandatory policy for reporting unusual incidents. In sustaining the failure to report charge, the ALJ acknowledged that Ambroise should have reported this incident "out of an abundance of caution." The Commission went further, explaining that it could not "fathom how any custodial staff in a correctional facility for women could reasonably interpret an unwanted kiss as anything but an unusual incident that needed to be reported."

We agree. Intimate contact between an inmate and a corrections officer whether initiated by the inmate or the officer can never be anything but unusual. In this regard, Ambroise had no choice but to report that incident.

27

As the DOC explains, the effect of Ambroise's withholding of this information directly implicates his ability to be trusted as a correctional officer, and it adversely affects prison security, discipline, and order. Herrmann, 192 N.J. at 35. His affirmative obligation -- indeed, his duty -- was simply to report the incident. His failure to do so risks the safety and security of the inmates, his fellow officers, and the institution. It amounts, in short, to an offense warranting termination of the officer's employment.

Additionally, Ambroise conceded he passed a personal message to another inmate at J.O.'s request. He was aware of the DOC's policy against undue familiarity, and he knew of the consequences that would result from violating such a policy. By blatantly ignoring the policy and acting at the behest of J.O., while also defending his conduct by pointing to the harmless nature of the message, Ambroise demonstrated his disregard for the policies of the institution. We agree with the Commission's finding that Ambroise's own testimony about the messages established undue familiarity regardless of the context or contents of the message. We also agree with the DOC that Ambroise's mere facilitation of passing the message between two inmates is unacceptable conduct when considering the "sui generis" nature of the prison environment. Bowden, 268 N.J. Super. at 305. As the DOC articulates, that act impacted prison security because at least two inmates now knew that

28

Ambroise, in his position as an officer, was willing to break the rules for their benefit. An improperly familiar relationship between a correctional officer and an inmate is something the system cannot tolerate because it compromises the safe and secure operations of the EMCF. Id. at 306. The seriousness of the violation thus independently justifies the DOC's recommended sanction of termination.

The DOC policies and regulations governing law enforcement personnel safeguard the orderly and disciplined administration of this State's correctional facilities. They enumerate those behaviors that will not be tolerated from trusted law enforcement. They hold this State's law enforcement officers to the highest standard of conduct, "one of the obligations [that officers] undertake[] upon voluntary entry into the public service." Phillips, 117 N.J. at 577 (quoting In re Appeal of Emmons, 63 N.J. Super. 136, 142 (App. Div. 1960)). Moreover, as the DOC notes, prisons rely upon and trust correctional officers to honorably execute their duties, and the siloed nature of these institutions cannot tolerate officers who undermine the exact protocols meant to effectuate the purpose of their position. See Bowden, 268 N.J. Super. at 305-06.

Although the Commission recognized the severity of Ambroise's conduct, it disagreed with the DOC's recommended sanction of termination.

29

The Commission instead applied progressive discipline and imposed a six-month penalty, explaining that because the most serious offense alleged, sexual misconduct, was not proven, and "given the way this entire matter proceeded," Ambroise should have another opportunity to show his competence. This rationale does not appropriately consider the DOC's recommended sanction of removal for Ambroise's combined infractions of failing to report J.O.'s kiss and forming an unduly familiar relationship with her. Nor does it support a downgrade, as emphasized by the DOC. The need for Ambroise's removal was underscored by the Commission's recognition that his conduct was highly concerning, yet nothing in this record supports Ambroise's ability to return to his position after six months. Herrmann, 192 N.J. at 31, 33.

Notwithstanding Ambroise's clean employment record, progressive discipline is not appropriate when "the misconduct is severe, when it . . . renders the employee unsuitable for continuation in the position, or when application of the principle would be contrary to the public interest." Id. at 33; see also Carter, 191 N.J. at 484-85. Given its unique expertise, the DOC concluded that Ambroise can no longer be trusted to work in a prison facility in light of these two offenses. The DOC's assessment should have been afforded significant weight because the gravity of Ambroise's conduct cannot

30

be understated.  See Bowden, 268 N.J. Super. at 306.  Through that lens, we agree with the DOC that there is no situation more severe and contrary to the public interest than when a correctional officer tarnishes the institution by knowingly compromising the safety and security of himself, his fellow officers, and the inmates.  Consequently, the Commission's decision to impose a six-month sanction is disproportionate to the serious and highly concerning offenses found in this record, and therefore, it is arbitrary, capricious, and unreasonable.  See Stallworth, 208 N.J. at 194-95.

## V.

The judgment of the Appellate Division is therefore reversed, and the appointing agency's recommended sanction of removal is reinstated.  The cause is remanded to the Commission to redetermine the officer's penalty in accordance with today's decision.  We do not reach the remaining arguments.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE NORIEGA's opinion.